**STATE of Minnesota, Respondent,**

v.

**Michael John WEATHERSPOON, Appellant.**

**No. C5–93–866.**

Court of Appeals of Minnesota.

March 22, 1994.

Review Denied June 15, 1994.

---

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. County Atty., St. Paul, for respondent.

John M. Stuart, State Public Defender, Richard D. Snyder, Sp. Asst. Public Defender, Fredrikson & Byron, P.A., Minneapolis, for appellant.

Considered and decided by RANDALL, P.J., and PARKER and DAVIES, JJ.

## OPINION

DAVIES, Judge.

The prosecution struck the only member of the venire panel who was an African-American. The trial court rejected the defense

claim that the prosecution's peremptory challenge was unlawful discrimination under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The jury convicted appellant Michael Weatherspoon, an African–American, of aggravated robbery and this appeal followed. We affirm.

## FACTS

Weatherspoon was charged with aggravated robbery. The trial court called 21 persons for the venire panel, including one African–American, Johnny Alexander. In response to the prosecutor's questions, Alexander revealed that he had worked for St. Paul Companies in St. Paul for one and one-half years, had lived in Minnesota for two and one-half years, was a high school graduate, and had attended college. He said he could be fair and impartial in judging the case.

Alexander also stated that one year earlier, along with all other residents of his apartment building, he had spoken to police officers about an alleged rape of a woman in the building. Alexander said he was satisfied the police were trying to do their job, and felt that the police treated him fairly and that nothing regarding that incident would make it hard for him to sit as a juror. When the prosecutor asked if any of Alexander's relatives had been accused of crimes, Alexander explained that his younger brother, as a juvenile, had been accused in Illinois of selling drugs two or three years earlier. He said he felt his brother had been treated fairly and nothing about the process would make it hard for him to sit as a juror.

After the prosecutor used a peremptory strike to remove Alexander, the defense challenged Alexander's removal based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor offered four grounds to justify its striking of Alexander: (1) Alexander's brother's experience; (2) a certain rapport observed between Alexander and defense counsel; (3) Alexander's answers to the prosecutor's questions about the police investigation in his apartment building; and (4) Alexander's residence in the community for only two years.

In rejecting the challenge, the trial court concluded:

No more easily than anyone else am I able to look into someone's head and determine motives and intentions. All I can go by is manifestations through a person's mouth, or by a person's behavior. I believe that [the prosecutor] has articulated racially neutral explanations for his challenge. I believe there is insufficient evidence to establish that his explanation was pretextual and that he instead was racially motivated in challenging Mr. Alexander. The challenge to the peremptory challenge I find must be denied based on my understanding of the law as it presently exists.

Following a trial, the jury—without Alexander's presence—found Weatherspoon guilty of aggravated robbery. This appeal followed.

## ISSUE

Did the trial court err in determining that appellant's constitutional rights were not violated when the prosecution removed the only African–American from the venire panel?

## ANALYSIS

The United States Supreme Court developed a three-step process to decide whether a prosecutor used a peremptory challenge with racially discriminatory intent. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This process has been summarized as follows:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York,* 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted). Only the last two steps are at issue in this appeal.

 Weatherspoon contends that the trial court erred by finding that the prosecu-

tor articulated race-neutral reasons for striking Alexander. We disagree. The Minnesota Supreme Court has recognized that a family member's involvement with a criminal investigation constitutes a race-neutral explanation for striking a juror. *State v. Scott*, 493 N.W.2d 546, 549 (Minn.1992); *see also United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987) (prospective juror's brother's robbery conviction sufficiently race-neutral), *cert. denied*, 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987); *People v. Hooper*, 133 Ill.2d 469, 142 Ill.Dec. 93, 109, 552 N.E.2d 684, 700 (Ill.1989) (same), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 239 (1990). Hence, Alexander's brother's criminal charge is a facially race-neutral basis for a peremptory challenge. The prosecutor's second reason, that Alexander had been in the community for only two years, is also a race-neutral explanation for striking a juror. In addition, the prosecutor's concern that a "certain rapport" was developing between Weatherspoon's attorney and Alexander, though troublesome, constitutes a facially race-neutral explanation. *See State v. McRae*, 494 N.W.2d 252, 257 (Minn.1992) (juror's demeanor and tone in responding may be factors in prosecutor's decision to strike). The prosecutor's final reason, Alexander's answers about police procedure during an investigation at Alexander's apartment complex, is also race-neutral. *Cf. United States v. Terrazas–Carrasco*, 861 F.2d 93, 94 (5th Cir.1988) (prosecutor's "intuitive assumptions" upon confronting a potential juror are valid reasons for exclusion). Thus, the trial court did not err by finding that the prosecutor articulated race-neutral reasons for striking Alexander.

 Once the prosecutor gives facially valid race-neutral explanations,

> the trial court, considering all the relevant facts bearing on the issue, must make what the Court in *Hernandez* characterized as an essentially factual determination of whether the defendant has proven that the prosecutor acted with discriminatory intent or purpose. * * * As always, of course, considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding

typically will turn largely on an evaluation by the trial court of credibility.

*McRae*, 494 N.W.2d at 254 (citations omitted). It is the trial court's duty to assess the validity of the prosecutor's explanations, and the reviewing court may not reverse unless the findings are clearly erroneous. *Id.*

Weatherspoon first argues that the trial court merely accepted the prosecutor's proffered reasons as valid without evaluating whether the prosecution's reasons were a pretext for discrimination. *See id.* at 257 (remanding when record shows trial court failed to determine whether articulated reason was actual basis for peremptory strike). We disagree. The record shows that the trial court recognized that its role was to examine whether the prosecutor's reasons were "pretextual" and that this examination rested in part on judging the prosecutor's credibility. Accordingly, we hold that the trial court followed the three-step process as enunciated in *Hernandez*.

We emphasize that the trial court's inquiry into the legitimacy of the explanations is crucial; otherwise a *Batson* challenge amounts to a right without a remedy. If no genuine inquiry takes place, nothing prevents the prosecutor from removing jurors on racial grounds by inventing "neutral" reasons to justify the peremptory strike. *See Batson*, 476 U.S. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring) ("Any prosecutor can easily assert facially neutral reasons for striking a juror."). We also note that some reasons, such as location of residence, prior involvement by juror or family member with the law, age, or level of education, provide objective and more easily verifiable race-neutral grounds for striking a juror. In contrast, more subjective reasons for striking jurors, such as a juror's rapport with counsel, body language, or tone of voice—in short, reasons reflecting an attorney's intuition— are less subject to verification and may alert a trial court to the attorney's unconscious or conscious discrimination. *See id.* at 106, 106 S.Ct. at 1728 (a prosecutor's "seat-of-the-pants instincts" may be another term for racial prejudice).

While we emphasize that inquiry into a prosecutor's explanations is vital, we are also

sensitive to the trial court's difficult task. In discussing the problems faced by the trial court in deciding a *Batson* challenge, one commentator noted:

> The requirement of a racially neutral explanation poses the conundrums that a requirement of nondiscriminatory purpose always poses. Whether the presence of one neutral reason is sufficient, whether the prosecutor must have been wholly uninfluenced by race, or whether the court must probe the prosecutor's psyche deeply enough to determine how he or she would have treated a white juror who exhibited similar characteristics is uncertain.

Albert W. Alschuler, "The Supreme Court and the Jury: Voir Dire, Peremptory Challenges and the Review of Jury Verdicts," 56 U.Chi.L.Rev. 153, 174 (1989). The trial court's concern about looking into the prosecutor's "head" to "determine motives and intentions" reflects the trial court's recognition of its responsibility as fact-finder. Nothing in the record indicates that the trial court abdicated this role.

■ Weatherspoon argues that the trial court erred by not finding pretextual discrimination. We disagree. First, Weatherspoon argues that the prosecutor's striking of Alexander is pretextual because the prosecutor ignored Alexander's statement that his brother's involvement with the law would not affect his ability to be a fair juror. But the prosecutor's explanation does not have to rise to a level that justifies striking for cause. *United States v. Briscoe*, 896 F.2d 1476, 1488 (7th Cir.1990) (citing *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

■ Second, Weatherspoon contends that the prosecutor gave false or exaggerated reasons for striking Alexander from the jury. But the prosecutor's minor inaccuracy in saying that Alexander had only lived in St. Paul for two years, when in fact he had lived there for two and one-half years, does not provide evidence of a discriminatory intent. *See McRae*, 494 N.W.2d at 257 (prosecutor's exaggeration about the juror's statements was not a sufficient race-neutral explanation).

■ Finally, Weatherspoon claims that the prosecutor's reasons were pretextual because the prosecutor did not apply the same reasoning to white jurors. *Walton v. Caspari*, 916 F.2d 1352, 1362 (8th Cir.1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1337, 113 L.Ed.2d 268 (1991). The circumstances suggest he applied the same standard. Four jurors, including Alexander, answered that they had family members or friends who had been accused of crimes; and the prosecutor struck three of them (thus using all three of his peremptory strikes). Weatherspoon's claim that the prosecutor should have removed the third and final white juror—instead of Alexander—is not persuasive. Similarly, the fact that jury members other than Alexander had been involved in police investigations of crimes, yet were not removed, does not by itself demonstrate discriminatory intent. Finally, Weatherspoon's argument that the prosecutor's form of questioning revealed conscious or unconscious discrimination is unconvincing. The types of questions asked of Alexander were also asked of the other jurors. Accordingly, the trial court did not err in finding that the prosecutor's reasons for striking Alexander were not discriminatory under *Batson.*

## DECISION

The trial court properly applied *Batson*'s three-step inquiry for challenges to peremptory strikes. The trial court did not err in finding that the prosecutor offered race-neutral, nondiscriminatory grounds for striking Alexander.

**Affirmed.**

RANDALL, Judge (concurring specially).

I concur specially in the result. The prosecutor had a peremptory challenge left, so he exercised it. That is the traditional method by which prosecutors and defense attorneys have tried cases. I concur with the majority that the trial court did a proper job of analyzing the *Batson* challenge, and then ruling the prosecutor should be allowed his peremptory. What I do not accept is any of the rationale that led to *Batson*. I suggest *Batson* set an unworkable standard that only interferes with our historic respect for a

criminal jury as a free and independent body. As long as *Batson* was confined only to criminal cases, and only to prosecutorial peremptories, its uselessness could be overlooked, and its damage minimized. But when *Batson* was forced on all criminal defendants and their attorneys, I suggest the United States Constitution and the Minnesota Constitution was dealt a lethal body blow in those articles protecting a Minnesota citizen's right to the assistance of counsel and the right to an independent jury.

Thus, the deeper issue I need to address is the *Batson/McCollum* extension which impermissibly entangled the judiciary in jury selection. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *see also Georgia v. McCollum*, — U.S. —, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

A *Batson* challenge is accurately summarized by the majority where it quotes:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted).

But there are really only two steps. There is not a real first step, as the so-called "prima facia" showing is completed merely by showing that the juror is a member of a protected class. This is not hard. *For now*, the Supreme Court has excluded the color white (caucasian). Justice Thomas, with clarity of vision, predicted the next battleground. He said:

Today, we decide only that white defendants may not strike black veniremen on the basis of race. Eventually, we will have to decide whether black defendants may strike white veniremen.

*McCollum*, — U.S. at —, 112 S.Ct. at 2360 (Thomas, J., concurring). I suggest that those who do not see right through *McCollum*, as the dissenters-concurrers did, will next suggest that "to make it fair," white will be included as a protected class of color subject to *Batson* challenges. For now, the first step of recognizing a protected class is complete when the juror can identify with African American, Hispanic American, Native American, and Asian American.

The essentials of a *Batson/McCollum* challenge are contained in the second and third steps. The second is when an attorney objects to a peremptory being used on any minority juror, even if the juror is of the race of the defendant. Immediately the attorney challenged has the burden of articulating a "race neutral" explanation for using a peremptory on that juror. Third, the trial court determines whether the attorney has produced a satisfactory explanation. If the attorney has not, the trial court will conclude the objecting attorney has carried the burden of proving purposeful discrimination, and the juror, despite the peremptory strike, sits to verdict.

*McCollum* extended *Batson* to *all* criminal defendants, and in so doing, disenfranchised *every* criminal defendant, regardless of race, by taking away their centuries-old right to the unhindered use of peremptory strikes.

Today, the underpinnings of *Batson/McCollum*, apply to all criminal defendants, and thus all criminal defendants now freefall into the darkness of a criminal trial, facing prison sentences or execution, with an attorney partially hamstrung by the removal of the traditional right to exercise peremptory strikes.

In Minnesota state courts, *all* defendants are now partially deprived of the right to counsel and the right to trial by jury spelled out in Article I, Section 6 of the Minnesota Constitution.

In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county or district wherein the crime shall have been committed, which county or district shall have been previously ascertained by law. In all prosecutions of crimes defined by law as felonies, the accused has the right to a jury of 12 members. In all other

criminal prosecutions, the legislature may provide for the number of jurors, provided that a jury have at least six members. The accused shall enjoy the right to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor *and to have the assistance of counsel in his defense.*

Minn. Const. art. I, § 6 (emphasis added).

The Sixth Amendment to the United States Constitution is worded close to the Minnesota Constitution:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense.

U.S. Const. amend. VI. But Minnesota has the full power, and has exercised it, to give more rights to its citizens than the Bill of Rights. The majority in *State v. Hershberger,* 462 N.W.2d 393 (Minn.1990), led by former Chief Justice Peter S. Popovich, sidestepped direct criticism of the United States Supreme Court, but said in clear language, Minnesota will go its own way.

While there might be merit in deciding the case and affirming [*State v.*] *Hershberger I* [444 N.W.2d 282 (Minn.1989) ] based on associational freedoms also infringed by the statute, thereby distinguishing *Smith II,* we decline to do so. It is unnecessary to rest our decision on the uncertain meaning of *Smith II* when the Minnesota Constitution alone provides an independent and adequate state constitutional basis on which to decide. *See, e.g., Michigan v. Long,* 463 U.S. 1032, 1040, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983) (respect for independence of state courts avoids federal review of issues of state law); L. Tribe, *American Constitutional Law* § 3–24, at 165–66 (2d ed. 1988) (doctrine of indepen-

dent and adequate state grounds prevents interference with state's interest in developing and applying its own law). We therefore decline to decide the applicability of [*Employment Div., Dept. of Human Resources v.*] *Smith II* [494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ] to the facts before us.

*Id.* at 396–97.

In *Friedman v. Commissioner of Pub. Safety,* 473 N.W.2d 828 (Minn.1991), the Minnesota Supreme Court interpreted the right to counsel under the Minnesota Constitution as being *more expansive* than the right to counsel under the Federal Constitution, even though the phrases are similarly worded. *Id.* at 831; *see also State v. Fuller,* 374 N.W.2d 722, 727 (Minn.1985) (supreme court recognized the possibility of different treatment of state constitutional provisions even where textually identical to a provision of the United States Constitution).

We move to the seminal part of *Friedman* which discusses Minnesota's right to counsel and a jury. As Justice Yetka stated:

Minnesota has a long tradition of assuring the right to counsel. Article I, section 6 of the Minnesota Constitution requires that "[i]n all criminal prosecutions the accused shall enjoy the right * * * to have the assistance of counsel in his defense."

*Friedman,* 473 N.W.2d at 831.

Of all those rights embodied in our Bill of Rights, the two most fundamental are the right to counsel and the right to trial by jury. Without them, there can be no constitutional rights at all.

*Id.* at 835. Individual states recognize that things are not necessarily the same in their state capitol as they are in Washington, D.C. The State of Minnesota is comfortable with this division of power.

I also offer for reflection, the obvious. The underlying traffic crimes in *Hershberger* and *Friedman,* although overshadowed by the constitutional principles therein, are crimes that under no circumstances are as serious as felony crimes which go up through murder in the first degree.

While federal courts may wish to struggle with *Batson/McCollum* and its progeny, I believe the Minnesota Constitution provides a clear answer: the defense attorney, not the trial judge and the prosecutor, represents the client during jury selection. If *Batson*, once written, had been segregated and left alone to apply to prosecutors in criminal cases only, although I suggest it is an unworkable standard and solves nothing, it could stand constitutional scrutiny at the federal level. It might even stand constitutional scrutiny under Minn. Const. art. I, § 6. But *Batson* was not left alone. It was followed by *McCollum*. This opinion will address the right to counsel and the right to jury issues *McCollum* makes us face.

The *McCollum* majority sets out the four essential prongs they deem necessary to extend *Batson* to criminal defendants. The *McCollum* majority concedes that all four prongs are essential to its holding. If any one of the four does not stand under our constitution, *McCollum* cannot stand in Minnesota. Thus, the four essential prongs of *Batson/McCollum* need to be torn apart, examined in the light of human experience, examined in the light of the truth of reality, and see if they stand the searching test of the Minnesota Constitution. We will need to make that walk through *McCollum* carefully, keeping hand in hand the *Batson* dissent of former Chief Justice Burger, the *McCollum* concurrences of Chief Justice Rehnquist and Justice Thomas, the *McCollum* dissents of Justices O'Connor and Scalia, and Justice Simonett's strong majority opinion in *State v. Davis*, 504 N.W.2d 767 (Minn.1993), *petition for cert. filed* (U.S. Nov. 1, 1993) (No. 93–6577).

Let us now move through the prongs of *McCollum*, scrutinize their reasoning against the leveled criticism of the concurrences and the dissents, and test where truth lies.

The *McCollum* prongs needed to support its extension to all criminal defendants are:

In deciding whether the Constitution prohibits criminal defendants from exercising racially discriminatory peremptory challenges, we must answer four questions. First, whether a criminal defendant's exercise of peremptory challenges in a racially discriminatory manner inflicts the harms addressed by *Batson*. Second, whether the exercise of peremptory challenges by a criminal defendant constitutes state action. Third, whether prosecutors have standing to raise this constitutional challenge. And fourth, whether the constitutional rights of a criminal defendant nonetheless preclude the extension of our precedents to this case.

*McCollum*, —— U.S. at ——, 112 S.Ct. at 2353.

The first question or prong is "whether a criminal defendant's exercise of peremptory challenges in a racially discriminatory manner inflicts the harms addressed by *Batson*." *Id.* In answering this prong, I start with the statement that the perceived harm in *Batson* was the alleged improper use of peremptories by southern regional prosecutors. If it exists, it can be lessened by education of prosecutors, not by *McCollum's* partial denial of the constitutional rights to legal assistance, and to trial by jury.

If you take the assumptions of the majority in *Batson* at face value, their solution was to take from prosecutors *in all 50 states* the traditional right to use peremptories. That somehow was to teach southern prosecutors a lesson. Then in *McCollum*, to further teach them a lesson, they disenfranchised every defendant of every color in the entire country by taking away the defendant's right to the historic free use of peremptory challenges. Who taught whom what lesson? If the perceived improper use of peremptories by southern prosecutors exists, it can be lessened by education and training. If they won't take education and training, discipline them, and if you have to, replace them. Courts, like hospitals, have an inherent right of control over those who practice within their walls. I do not want to get sidetracked into where blame, if any, should fall for the reasons behind *Batson*. Nor do I have the authority to impose a solution. That is for another day and for other courts. But what I want to argue strongly and vociferously, like the dissents-concurrences in *McCollum*, is that the *Batson/McCollum* solution to a perceived problem created a

worse, and a monstrous problem, which did not exist before.

I agree with Justice Scalia that *McCollum* reduced *Batson* to terminal absurdity! Justice Scalia stated:

> I agree with the Court that its judgment follows logically from *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. [614] 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). For the reasons given in the *Edmonson* dissents, however, I think that case was wrongly decided. Barely a year later, *we witness its reduction to the terminally absurd:* A criminal defendant, in the process of defending himself against the state, is held to be acting on behalf of the state. *Justice O'Connor demonstrates the sheer inanity of this proposition (in case the mere statement of it does not suffice), and the contrived nature of the Court's justifications.* I see no need to add to her discussion, and differ from her views only in that I do not consider *Edmonson* distinguishable in principle—except in the principle that a bad decision should not be followed logically to its illogical conclusion.
>
> Today's decision gives the lie once again to the belief that an activist, "evolutionary" constitutional juris-prudence always evolves in the direction of greater individual rights. In the interest of promoting the supposedly greater good of race relations in the society as a whole (make no mistake that that is what underlies all of this), *we use the Constitution to destroy the ages-old right of criminal defendants to exercise peremptory challenges as they wish, to secure a jury that they consider fair.* I dissent.

*McCollum*, —— U.S. at ——, 112 S.Ct. at 2364–65 (Scalia, J., dissenting) (emphasis added).

To further comment on the first prong of *McCollum,* let us focus on that part of Justice Scalia's dissent:

> In the interest of promoting the supposedly greater good of race relations in the society as a whole (make no mistake that that is what underlies all of this), we use the Constitution to destroy the ages-old right of criminal defendants to exercise peremptory challenges as they wish, to secure a jury that they consider fair.

*Id.* at ——, 112 S.Ct. at 2365 (Scalia, J., dissenting). The question of race relations, relationships between blacks and whites, between whites and all others, between persons of color and all others, can only be looked at in the light of human experience.

Equally important, I do not for one minute believe that the state of race relations in this country's courts can all be laid at the feet of regional prosecutors and stop the analysis there. I suggest that strong reflection be given to that passage in *Blue Highways—A Journey Into America* where the author tells of a conversation he had with a young self-educated woman in St. Martinville, Louisiana:

> My childhood was warm and happy—especially when I was reading. Maybe I was too young to see. I don't know. I go on about the town, but I love it. I've put my time in the cities—New Orleans, Philly. Your worst Southern cracker is better than a Northern liberal, when it comes to duplicity anyway, because you know right off where the cracker crumbles. With a Northerner, you don't know until it counts, and that's when you get a job done on yourself.

William Least Heat–Moon, *Blue Highways— A Journey Into America,* 121–22 (1982).

The young woman's observations on the solution are worth study:

> On the way back to the agency, she said, "I'll tell you something that took me a long time to figure out—but I know how to end race problems."
>
> "Is this a joke?"
>
> "Might as well be. *Find a way to make people get bored with hating instead of helping.* Simple." She laughed. "That's what it boils down to."

*Id.* at 123 (emphasis added).

It is impossible for a government tribunal, whether executive, legislative or judicial, to force people to "like each other" and come up with a punishment that "cures their thinking" when they don't. Yet *Batson/McCollum* tries to do this. When an attorney supposedly "thinks wrong" about a prospective juror,

the *client,* the defendant (not the attorney), is punished by being denied a peremptory and by having a juror placed on his criminal case to whom he objects.

We need to accept the truth of human experience. People of different races may react differently to each other at different times, and in different fact situations. Criminal cases are fact specific; each is *sui generis.* People of the same race might not always like each other. People of color might not always like other people of color. People on an athletic team, a tribunal, a court, a class, might not always like each other. Individual members of a family might harbor dislikes for each other. The relationship built on love, that of husband and wife, often contains individuals who end up not liking each other. With the rate of marriage breakups almost equalling the rate of new marriages, we know that in one of the most sacred of relationships, people end up not liking each other. The process of divorce, the "punishment," tends not to make spouses like each other any better after that punishment than they did before.

I cannot understand the seeming uncontrollable need of the judiciary to tinker with voir dire and the traditional free use of peremptory challenges that has historical and constitutional roots going back toward the Magna Carta.

An institution like the peremptory challenge that is part of the fabric of our jury system should not be casually cast aside, especially on a basis not raised or argued by the petitioner. As one commentator aptly observed:

> "The real question is whether to tinker with a system, be it of jury selection or anything else, that has done the job for centuries. We stand on the shoulders of our ancestors, as Burke said. It is not so much that the past is always worth preserving, he argued, but rather that 'it is with infinite caution that any man ought to venture upon pulling down an edifice, which has answered in any

tolerable degree for ages the common purposes of society....' "

*Batson,* 476 U.S. at 133–34, 106 S.Ct. at 1742–43 (Burger, C.J., dissenting) (citation omitted).

At times there have been abortive attempts to shorten the voir dire period, and in federal courts the general rule requires the attorneys to ask the questions through the judge and not directly.[1]

We have not seen any movement by the judiciary to artificially shorten or eliminate opening statements and closing summations by the defense attorney. I suggest to do so would be unthinkable. Yet, part of the rationale of the *McCollum* majority in extinguishing the traditional use of peremptory strikes for a defendant is that "peremptory challenges are not constitutionally protected rights" but rather are some form of state rights and thus can be forbidden. I suggest this is not a legal argument, because as a legal argument it cannot stand. I suggest it is nothing more than a makeshift statement to support an unsound conclusion.

A careful scrutiny of the Sixth Amendment of the Bill of Rights and the corresponding article of the Minnesota Constitution will show *only,* by name, the right of a defendant to trial by jury, the right to cross examination, the right to produce evidence, and the right to an attorney. Both are silent as to the right to make opening statement and closing argument. I suggest that if the State of Minnesota, by a rule of criminal practice, or by judicial or legislative fiat, put into effect a law that stated that henceforth criminal defendants would have no right to an opening statement or a closing summation, the law would fall immediately. Yet, that is parallel reasoning to the *McCollum* majority for arbitrarily taking away a defendant's unhindered peremptory strikes. I suggest that if Minnesota were to attempt the elimination of opening and closing statement by defendant's attorney, if that law went into effect at midnight, at 9:00 a.m. the next morning an able defense attorney would walk into the nearest federal court with a write of habeas

---

1. For a thorough discussion of the need for, and the case law supporting the right to, searching voir dire by trial attorneys and the failure of the federal system, *see Race and Jury Selection in Minnesota: Materials for Discussion* (Office of the State Public Defender, 2d ed. 1994).

corpus and walk out at 9:15 a.m. hand-in-hand with his client. I suggest that after signing the order, the federal judge would retire to chambers, contact colleagues, and in a shakened voice describe the dark cloud he has just witnessed arising over the state.

The Bill of Rights does not attempt to itemize by name every single due process constitutional right contained therein. Some have been left to the common sense and historical perspective the framers of the Constitution assumed successors would have.

Before we "tinker" with the right of traditional peremptories that criminal defendants have always enjoyed, "[i]n the interest of promoting the supposedly greater good of race relations," *McCollum*, —— U.S. at ——, 112 S.Ct. at 2365 (Scalia, J., dissenting), perhaps reflect on a statement by Jean–Michel Cousteau:

> "We cannot play God and make decisions without knowing how nature functions. We need to allow nature to do its own thing and not intervene as we do all the time. In order for us to get a little wiser, we need to study more. We cannot study and kill at the same time."

Laurel Murphy, *Cousteau: The Next Generation*, Hawaiian, Feb. 1994, at 22.

I suggest there is truth here as we study means to improve human relations. Relative to the study of peremptories in capital murder cases, I found important his observation that "[w]e cannot study and kill at the same time." *Id.*

Cousteau's observations as to the future of our relationship to the world of nature is notable:

> "Humans have been able to move mountains and do formidable things in a way which is not something you can put in a computer and predict. * * * No experts were able to tell you the Berlin Wall was going to be taken down or that the Palestine Liberation Organization and Israel would shake hands one day. Man is capable of formidable recoveries. But it is unpredictable, other than the fact that you know he can do it.
>
> It's coming from some place you cannot put in a computer. The heart. Because of

that, I believe we can make it * * *. People protect what they love."

*Id.* at 23.

I suggest we protect our system of trial by jury with a criminal defendant assisted by counsel.

The first prong of *McCollum* is built on the inflexible *Batson* assumption, an assumption I call questionable, that using peremptory strikes on minorities always carries an inherent racial tinge. I suggest *Batson/McCollum*, while claiming they wanted to do away with racial stereotyping, bought into stereotyping the traditional thought process of trial attorneys.

I suggest the *Davis* majority needs to be read three times, digested, put on the shelf for a week, and then reread again to understand why unhindered peremptory challenges are necessary for the attorney to protect the client. In *Davis,* the proposition was simple: should *Batson/McCollum* be extended to religion in this state? I suggest Justice Simonett foresaw *McCollum's* inevitable extension and tried to waylay it. In *Davis* he states:

> We begin our analysis with a closer look at the role of the peremptory. While jurors have their individual preconceived notions and prejudices, it is assumed that they can set them aside so as to be fair and impartial. The purpose of voir dire is to test that assumption. If it is made to appear that a prospective juror cannot be fair, the juror may be challenged for cause. *The peremptory is needed, however, if the challenge for cause is denied by the court. It is needed also when there is legitimate concern for a juror's fairness but this concern is insufficient to be a challenge for cause.* It happens often enough that a juror expresses doubt about being able to be fair, but then opposing counsel or the judge ostensibly "rehabilitates" the juror; in this problematic situation, the peremptory is useful. *Also, without the peremptory, trial counsel may be deterred from asking probing questions on voir dire for concern that any hostility inadvertently raised could not be remedied by a peremptory strike.*

In other words, the peremptory gives added assurance of an accurate verdict by "resolv[ing] doubts (up to a specified number) in favor of exclusion." The fact that some unbiased jurors may be excused in the process is an affordable price to pay for removing doubts about a particular juror's impartiality and competence, *especially when the vote of one biased juror can make a critical difference.*

Then, too, "the role of the litigants in determining the jury's composition provides one reason for wide acceptance of the jury system and of its verdicts." The randomness built into the jury pool to obtain a cross-section can seem, to the apprehensive litigant, to be arbitrary and unfair, leaving the litigant to the "luck of the draw." *The peremptory alleviates this apprehensiveness by allowing the parties to exercise their own intuitive judgment with respect to perceived juror bias.*

*Davis,* 504 N.W.2d at 770 (citations omitted) (emphasis added).

Justice Simonett's reasoning supporting the need for unfettered peremptory strikes is airtight. It cannot be attacked. But, while I agree completely with his *Davis* analysis, I note that he attempted to distinguish *Batson/McCollum* rather than take it head on. *Davis* distinguished religion from race by presuming that constitutional protection, given to race by *Batson,* need not be extended to religion in Minnesota because peremptory challenges had not yet made a demonstrable attack on religion. I suggest that any such further attempts to slow down the spread of *Batson/McCollum* by distinguishing it, rather than rejecting it, will eventually fail, and Justice Thomas' prediction that all peremptories will cease will become reality. If *Batson/McCollum* does not do justice, overrule it.

I take it as a given that federal courts will come to interpret the United States Constitution to protect free speech, race, color, creed, religion, and gender, in approximately the same vein. When rights are equal, and a right within that class is attacked, it is not an argument that will hold out forever that a right can be attacked because it is attacked less often than another. Equal rights will come to be construed to require equal protection. Just below that grouping of rights, the federal courts and the State of Minnesota will come to protect group "rights" relating to national origin, marital status, age, occupation, disability, status with regard to public assistance, economic status, and so on. *This will happen* unless *Batson/McCollum* is found not to be in accord with the Minnesota Constitution.

Four justices on the *McCollum* court had the sense and the courage to speak out against it. We cannot have less.

If we do not determine now that *Batson/McCollum* has no place in Minnesota, the above mentioned categories, which, by definition, include the entire human race, will spell the end of the traditional right of the defendant and his attorney to exercise peremptories. This has to be. Gender, ethnic origin, age, economic status are all inclusive; everybody has one. Minn.Stat. § 593.32, subd. 1 (1992), mentions race, color, religion, sex, national origin, economic status, and physical and sensory disability.

Minnesota will be left only with the challenge for cause and *Batson* "mini-challenges" based on "protected" classes into which every juror will fall. Do not suggest this will not happen. The barbarian is at the gate.

It needs to be understood that when competent trial attorneys, criminal and civil, exercise peremptory challenges, some of the factors swirling in their minds, built by previous trial-honed intuitive judgment, include the answers of the jurors to voir dire questions, their demeanor, and their nonverbal expressions. *Also* measured in are the intangible factors of race, color, creed, ethnic origin, marital status, occupation, gender, religion, economic status, age, occupation of spouse and family, physical disabilities, if any, education, and others, including the facts of the case. Trial attorneys *do not* take into account these multiple factors in a spirit of pejorative racism, sexism, religiousism, ageism, occupationism, married statusism, or any other of the "isms" that we seem to chase with a net like butterflies. Their sole professional focus is on their responsibility to protect their client's cause, and when they

factor in different match-ups that may exist between their client, the victim, and the juror, they are simply doing what competent attorneys have done for centuries, their duty. If from time to time an improper use of one of the above factors is thought to exist, do not attempt to cure an incurable problem by slashing with a bloody knife the rights of criminal defendants. I call the problem incurable because the problem, if it exists, exists in the subjective recesses of the attorney's mind. *Batson/McCollum* forces trial judges to be "thought police" and gives them, as a means of punishment for those who "don't think right," the power never before present in this country, the power to place on a criminal jury a juror upon whom the defendant has exercised a peremptory strike.

It is worth noting that every nation, every dynasty, every Reich, that has ever created a class of thought police and given them the power of punishment has, mercifully, either been wholly discredited in the eyes of the civilized world or has disappeared from existence and lives only in history books.

With laser-like directness, Justice O'Connor pinpointed the sleight of hand we deal with today.

What really seems to bother the Court is the prospect that leaving criminal defendants and their attorneys free to make racially motivated peremptory challenges will undermine the ideal of nondiscriminatory jury selection we espoused in *Batson*. The concept that the government alone must honor constitutional dictates, however, is a fundamental tenet of our legal order, not an obstacle to be circumvented. This is particularly so in the context of criminal trials, where we have held the prosecution to uniquely high standards of conduct. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (disclosure of evidence favorable to the accused); *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done").

*McCollum*, — U.S. at ——, 112 S.Ct. at 2363–64 (O'Connor, J., dissenting) (citation omitted).

What she states is that the Court simply could not leave its hands off of *Batson*, but had to destroy individual liberties struggled and fought for through the centuries, to give life to the shopworn cliche, "make a level playing field." Justice O'Connor stated accurately the underpinnings of the extension of *Batson* to *McCollum*, and stated why the extension is constitutionally suspect and should not stand.

The second prong of *McCollum* is:

whether the exercise of peremptory challenges by a criminal defendant constitutes state action.

*Id.* at ——, 112 S.Ct. at 2353.

Upon reflection and reasoning, the second prong constitutes the cruelest irony of all. To legitimize the taking away of part of a defendant's right to trial by jury, and part of a defendant's right to the assistance of counsel under *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the criminal defense attorney is called a "government actor" and somehow made an official part of the process by which his client is tried, and if convicted, punished by prison or death.

The dissent of Justice O'Connor in *McCollum*, once again, exposes the reasoning of the majority:

The Court reaches the remarkable conclusion that criminal defendants being prosecuted by the State act on behalf of their adversary when they exercise peremptory challenges during jury selection. The Court purports merely to follow precedents, but our cases do not compel this perverse result. *To the contrary, our decisions specifically establish that criminal defendants and their lawyers are not government actors when they perform traditional trial functions.*

\* \* \* \* \* \*

What our cases require, and what the Court neglects, is a realistic appraisal of the relationship between defendants and

the government that has brought them to trial.

We discussed that relationship in *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), which held that a public defender does not act "under color of state law" for purposes of 42 U.S.C. § 1983 "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." We began our analysis by explaining that a public defender's obligations toward her client are no different than the obligations of any other defense attorney. These obligations preclude attributing the acts of defense lawyers to the State: "[T]he duties of a defense lawyer are those of a personal counselor and advocate. It is often said that lawyers are 'officers of the court.' But the Courts of Appeals are agreed that a lawyer representing a client is not, by virtue of being an officer of the court, a state actor . . . ."

We went on to stress the inconsistency between our adversarial system of justice and theories that would make defense lawyers state actors. "In our system," we said, *"a defense lawyer characteristically opposes the designated representatives of the State." This adversarial posture rests on the assumption that a defense lawyer best serves the public "not by acting on behalf of the State or in concert with it, but rather by advancing 'the undivided interests of his client.'"* Moreover, we pointed out that the independence of defense attorneys from state control has a constitutional dimension. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), "established the right of state criminal defendants to the guiding hand of counsel at every step in the proceedings against [them]." *Implicit in this right "is the assumption that counsel will be free of state control.* There can be no fair trial unless the accused receives the services of an effective and independent advocate." Thus, the defense's freedom from state authority is not just empirically true, but is a constitutionally mandated attribute of our adversarial system.

*McCollum*, —— U.S. at ——, 112 S.Ct. at 2361–62 (O'Connor, J., dissenting) (emphasis added) (citations omitted). I suggest *McCollum*, in its second prong, takes the heart and soul out of *Gideon v. Wainwright*.

Justice O'Connor further said:

The Court also seeks to *evade Dodson's logic by spinning out a theory that defendants and their lawyers transmogrify from government adversaries into state actors when they exercise a peremptory challenge, and then change back to perform other defense functions. Dodson,* however, established that even though public defenders might act under color of state law when carrying out administrative or investigative functions outside a courtroom, they are not vested with state authority "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." Since making peremptory challenges plainly qualifies as a "traditional function" of criminal defense lawyers, *Dodson* forecloses the Court's functional analysis.

*Id.* at ——, 112 S.Ct. at 2362 (O'Connor, J., dissenting) (emphasis added) (citations omitted). Somehow, now, in the late 20th century, the jury has become a governmental body, with the state as its protector, so as to set the stage for a necessary underpinning of the rule forbidding criminal defendants the traditional use of peremptory challenges!

To support its second prong, the *McCollum* majority endows a criminal defendant's jury with the status of an official "governmental body."

In regard to the second principle, the Court in *Edmonson* found that peremptory challenges perform a traditional function of the government: "Their sole purpose is to permit litigants to assist the government in the selection of an impartial trier of fact." And, as the *Edmonson* Court recognized, the jury system in turn "performs the critical governmental functions of guarding the rights of litigants and 'insur[ing] continued acceptance of the laws by all of the people.'"

*Id.* at ——, 112 S.Ct. at 2355 (citations omitted).

I suggest our entire history, and England's entire history of what constitutes a jury of

private citizens, tells us that they are and were intended to be 180 degrees away from the "composition of a governmental body." Maybe eight to ten centuries of case law and common law tells us that the *sine qua non* of a criminal jury is that its private citizens are unfettered, unhindered, and untouched by the government telling them what to think, and how to think it. Our judicial system, as we know it, cannot exist without this independence of the jury.

Prong three of *McCollum* states:

whether prosecutors have standing to raise this constitutional challenge.

*Id.* at ——, 112 S.Ct. at 2353. Part of the majority's reasoning is contained in the following:

The State's relation to potential jurors in this case is closer than the relationships approved in *Powers* [*v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)] and *Edmonson*. As the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial.

*Id.* at ——, 112 S.Ct. at 2357. I suggest this description of the prosecutor as the representative of all the citizens in a criminal jury pool is a conflict of interest, so deep between adversaries in a criminal case, that it needs to be rooted out, amputated, and put to rest with dignified interment.

Again, Justice O'Connor pinpoints the legal reasoning needed to overturn the third prong, at least, I hope, in the State of Minnesota.

[A] criminal defendant is by design in an adversarial relationship with the government. Simply put, the defendant seeks to strike jurors predisposed to convict, while the State seeks to strike jurors predisposed to acquit. The *Edmonson* Court clearly recognized this point when it limited the statement that "an adversarial relation does not exist between the government and a private litigant" to "the ordinary context of *civil litigation in which the government is not a party*." [Emphasis in original.]

*From arrest, to trial, to possible sentencing and punishment, the antagonistic relationship between government and the accused is clear for all to see.*

*Id.* at ——, 112 S.Ct. at 2363 (O'Connor, J., dissenting) (emphasis added) (citation omitted).

The adversarial relationship between prosecutor and his client, the state, and the criminal defense attorney and his client, *has to be honestly understood.* A criminal trial is not some mythical "search for the truth" as described from time to time in literature. Literature written, I suggest, by those who have never stood in the courtroom and defended a citizen accused of a serious crime.

Ethical prosecutors do not take citizens at random, come up with a charge at random, and throw it up to a jury "to see where truth lies." Prosecutors attempt to determine the truth, at least as they see it, far in advance of trial. So there is no mistake as to this, check the ABA ethical standards for prosecutors.

Standard 3–3.9 Discretion in the charging decision

(a) It is unprofessional conduct for a prosecutor to institute, or cause to be instituted, or to permit the continued pendency of criminal charges when it is known that the charges are not supported by probable cause. A prosecutor should not institute, cause to be instituted, or permit the continued pendency of criminal charges in the absence of sufficient admissible evidence to support a conviction.

American Bar Ass'n, Standards for Criminal Justice § 3–3.9 (2d ed. 1986).

Prosecutors are supposed to, before bringing a charge, satisfy themselves from the evidence law enforcement has brought them that there is probable cause that the person they are about to charge has done it and deserves punishment. Prosecutors proceed to trial, not "searching for the truth," but bound and determined to convince the jury beyond a reasonable doubt what they themselves think to be true.

On occasion, a prosecutor, finding new evidence, will dismiss the charge before trial, or from time to time the new evidence surfaces a'la Perry Mason during trial and there is a

dismissal. But I suggest Perry Mason endings tend only to happen on late night TV if your station carries reruns. For the most part, the nitty-gritty of criminal defense is the state assuming that they have the right person, and that the person deserves punishment, and the citizen defendant, once supplied with the complaint which outlines the charges and the state's hoped-for punishment, now terrified, seeks the help of an able defense attorney to assist in preserving liberty and, at times, life.

I suggest *Batson* is a black hole, a bottomless lake from the start, protected only by the too thin veneer of ice that restricted it to prosecutors in criminal cases. *Batson*'s underpinnings do not even support *Batson*. With one stroke of the pen, it disenfranchised the approximate 80% of this country (94% in Minnesota) that is of caucasian origin. *Batson* said to prosecutors you need not acknowledge the cultural experience of growing up white. It is of no concern to us when you select juries. You can select white jurors or use the traditional peremptory strike to remove them from the panel.

A quick glance at section 1 of the Fourteenth Amendment[2] shows that states cannot abridge the privileges of *any* person. The rational of *Batson/McCollum* either treats white jurors as a disfavored class or treats minority jurors as a favored class, take your pick. It cannot be debated that *Batson/McCollum* puts minority jurors in a favored class as the opinion directs all courts to give them, in effect, a rebuttable presumption that they will be allowed to sit, a presumption not given to all jurors. How do we, as a country, justify the "affirmative action" program of *Batson/McCollum* when it jeopardizes formerly held trial rights and puts at risk the liberty, and life of criminal defendants of color, of all criminal defendants, in all cases. The reasons *Batson/McCollum* puts at risk all defendants in murder cases applies with the same logic, but just slightly less intensity, in all criminal cases. It would be impossible to devise a bright line by which, for instance, the pre-*Batson* use of peremptory challenges would apply to crimes like burglary and aggravated robbery and worse, but leave *Batson/McCollum* challenges available for crimes of felony theft or less. If *Batson/McCollum* is an impossible standard, and has no constitutional footings, it cannot be applied to any crime.

The grim reality of the death penalty, the method by which government executes its citizens, has to be realized. Today, approximately 40 of the 50 states authorize the use of the death penalty. Other states, like Minnesota, have life without parole and/or lengthy mandatory minimum sentences. The importance of a *full* jury trial, and the *unhindered* assistance of counsel, cannot be overemphasized. I suggest these rights, forming the cornerstone of *Friedman,* need to take precedence over social experiments in jury selection.

> Of all those rights embodied in our Bill of Rights, the two most fundamental are the right to counsel and the right to trial by jury. Without them, there can be no constitutional rights at all.

*Friedman,* 473 N.W.2d at 835.

Although a central question in criminal trials is, "Did the defendant do it?," a powerful and constitutionally protected issue is the guarding of the process by which we, as a people, decide who shall live, and who shall die.

A murder trial is a controlled war. In states with the death penalty, it is a war to the death. In states like Minnesota, with a 30-year mandatory minimum before parole can be considered (among the highest in the nation), it is a war against living death. Is the analogy to war overstated? I suggest not. In a hot war, participants divide into four simple and identifiable classes. Some emerge unscathed, some suffer moderate injury, some suffer serious injury, and some die. In the cold war of a murder trial, the

---

2. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1.

stakes are exactly the same. Flesh, in the form of a citizen defendant, walks into court presumed innocent and awaits trial. Some flesh walks out unscathed, some flesh suffers moderate injury, some flesh suffers serious injury, and some flesh burns. "[T]he defendant * * * faces imprisonment or even death." *McCollum*, — U.S. —, 112 S.Ct. at 2360 (Thomas, J., concurring).

We can make jury selection a grand social experiment, on that day, when the state and federal government stops trying to put its citizens on death row and in prison for half to all of their natural lives. I suggest that the framers of the Constitution and the Sixth Amendment of the Bill of Rights contemplated adversarial litigation at a level of intensity dignifying the stakes.

I suggest the office of the Attorney General of the United States is proper to look at. The office represents the chief law enforcement officer for the entire federal system, state prosecutors can look to it for guidance, and the attorney general often has input to the United States Supreme Court upon request and through amicus curiae.

I suggest that during the busy work days of John M. Mitchell, Richard G. Kleindienst, Edwin Meese III, and Richard Thornburgh, their time was fully taken up in authorizing the detection, apprehension, trial, and conviction of people thought to deserve punishment. It would be unfair to take from that schedule by giving them the added responsibility of being the guardian of all the jurors who will decide the defendant's fate. A memorandum from Richard Thornburgh, then Attorney General of the United States, to all Justice Department litigators, dated June 8, 1989, on stationery of the office of the Attorney General, Washington, D.C., is instructive. It discusses in pertinent part Disciplinary Rule 7–104(A)(1) of the ABA Model Code of Professional Responsibility and its successor, Rule 4.2 of the ABA Model Rules of Professional Conduct. The subject of said rule is communication with persons represented by counsel.

Disciplinary Rule 7–104(A)(1), as cited in the memorandum, provided:

> During the course of his representation of a client a lawyer shall not: communicate or cause another to communicate on the subject of the representation by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

It was also noted in the memorandum:

> A lawyer may not avoid the prohibition by making such a communication through an agent or investigator. *See* ABA Model Rule 8.4(a); *United States v. Partin*, 601 F.2d 1000 (9th Cir.1979); *United States v. Thomas*, 474 F.2d 110 (10th Cir.1973).

Phrased in other terms, this states that during the course of the representation of the government, its client, a federal prosecutor, shall not contact or cause someone else to contact the defendant without prior consent of the defendant's attorney or unless otherwise authorized by law. The memorandum also cited:

> Rule 4.2 of the ABA Model Rules of Professional Conduct, * * * amended in February 1987, provides with respect to *ex parte* contacts:
>
> > In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The contents of Thornburgh's eight-page memo, while discussing the rule in depth, center on the government's perceived need to obtain information against suspects through the use of confidential informants working for the government and not obtaining permission of the defendant's attorney to be informed of this contact. In pertinent part, the memo states:

> Indeed, the Department has consistently taken the position that the Supremacy Clause of the Constitution does not permit local and state rules to frustrate the lawful operation of the federal government. *See Ethical Restraints of the ABA Code of Professional Responsibility on Federal Criminal Investigations*, 43 Op. Off. of Legal Counsel 576, 601–02 (1980).

The Department has taken the position that, although the states have the authority to regulate the ethical conduct of attorneys admitted to practice before their courts, *Nix v. Whiteside*, [475 U.S. 157, 166], 106 S.Ct. 988, 994, [89 L.Ed.2d 123] (1986), that authority permits regulation of federal attorneys only if the regulation does not conflict with the federal law or with the attorneys' federal responsibilities, *see Sperry v. Florida*, 373 U.S. 379, 402, [83 S.Ct. 1322, 1334, 10 L.Ed.2d 428] (1963).

\* \* \* \* \* \*

It is the clear policy of the Department that in the course of a criminal investigation, an attorney for the government is authorized to direct and supervise the use of undercover law enforcement agents, informants, and other cooperating individuals to gather evidence by communicating with any person who has not been made the subject of formal federal criminal adversarial proceedings arising from that investigation, *regardless of whether the person is known to be represented by counsel.*

\* \* \* \* \* \*

As part of the ongoing process of ensuring that DR 7–104 cannot be invoked to cripple federal investigative techniques, and to provide a consistent source to articulate and to implement the policy of the Department in this area, Edward S.G. Dennis, Jr., Assistant Attorney General, Criminal Division, will be available to provide advice and assistance in determining if a particular contact with a represented person is consistent with the policies of the Department. Any question about contacting represented parties should be referred to:

Edward S.G. Dennis, Jr.
Assistant Attorney General
Criminal Division
FTS 533–2601

All supervisory attorneys should ensure that all Department attorneys are aware of the position articulated in this Memorandum and the availability of advice and assistance in the Department.
(Emphasis added.)

Reprinting portions of this memorandum is not meant to cast either merit or aspersion upon it, but to identify the truth known, and always known, to prosecutor and defense counsel. The two are adversarial. The two are locked in a conflict over the alleged guilt and need for punishment of a citizen. Justice O'Connor points out the truth of criminal trials needs to be accepted before so-called improvements to criminal trials can be made.

The present occupant of the Office of Attorney General, Janet Reno, having established herself as a fair but firm person who intends to authorize the detection, apprehension, trial, and punishment of those citizens deemed to have committed crimes, will, I suggest, not seek the added burden of being "the representative" of all the jurors in a criminal trial.

The criminal jury in this country, since the moment the Mayflower touched anchor, has always been prized as an *independent body,* not subject to force, control, or "protection," by either defense or prosecution. It is entrusted, as an *independent body,* with the sacred duty, conducted free from governmental control, of adjudging the merits of a government's complaint against a citizen, measured against the citizen's presumed innocence.

Speaking now only for the State of Minnesota, I suggest any tampering with the concept of our juries as an independent body, free of government control, will be met with stonewall rejection by the Bench and Bar and the citizens of this state.

The fourth prong of *McCollum* is as follows:

whether the constitutional rights of a criminal defendant nonetheless preclude the extension of our precedents to this case.

*McCollum,* —— U.S. at ——, 112 S.Ct. at 2353. Restated, the fourth prong of the *McCollum* majority is that the constitutional right of an individual juror to sit on a specific case surmounts the constitutional right of the defendant in a criminal jury trial to the free use of peremptory strikes.

I suggest the concurrence and dissents in *McCollum* test the reasoning of the majority, and bury it. Justice Thomas states:

> Our departure from [*Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880)] has two negative consequences. First, it produces a serious misordering of our priorities. In *Strauder*, we put the rights of defendants foremost. Today's decision, while protecting jurors, leaves defendants with less means of protecting themselves. Unless jurors actually admit prejudice during *voir dire*, defendants generally must allow them to sit and run the risk that racial animus will affect the verdict. *In effect, we have exalted the right of citizens to sit on juries over the rights of the criminal defendant, even though it is the defendant, not the jurors, who faces imprisonment or even death. At a minimum, I think that this inversion of priorities should give us pause.*

*Id.* —— U.S. at ——, 112 S.Ct. at 2360 (Thomas, J., concurring) (emphasis added) (citation omitted).

In this passage, I hear echoes of the 19th century philosopher, Jean Baptiste Lacordaire: "Everyone looks at what I look at but no one sees what I see." What Justice Thomas is stating here I aid by amplification. He asks, "How do those who die have less rights than those who watch?" I suggest that Justice Thomas, like John Donne, is asking us not to wonder for whom the bell tolls. I suggest Justice Thomas is asking us not to reflect in wonderment, but to reflect.

I suggest that for the Minnesota judiciary to debate this prong, as if possibly the individual juror's right to survive a peremptory could surmount the right of a defendant in a criminal trial to exercise one, will result in the loss of credibility, possibly irreversible.

Justice Thomas foreshadowed the crab grass effect of *Batson*. The United States Supreme Court today has under advisement the extension of *Batson/McCollum* to gender. *J.E.B. v. Alabama ex rel. T.B.*, 606 So.2d 156 (Ala.Civ.App.1992), *cert. denied* (Ala. Oct. 23, 1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 242 (1993). The *McCollum* majority hints at a further extension to ethnic origin and religion.

> "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion."

*McCollum*, —— U.S. at ——, 112 S.Ct. at 2359 (quoting *Ristaino v. Ross*, 424 U.S. 589, 596, n. 8, 96 S.Ct. 1017, 1021, n. 8, 47 L.Ed.2d 258 (1976)).

For myself, I would never suggest that there is a collision between the rights of an individual juror and the defendant on trial. That is because I do not accept any of the underpinnings of *Batson/McCollum*. I suggest that the rights of jurors to sit on juries are bound up only in their right not to be excluded from the initial impaneling of the venire pool. At present, Minnesota uses voter registration and car registration lists. If we wish to expand that to include a wider class of citizens, it is not hard to do so. The prospective jury list can be expanded to include, for instance, a list of all those who have children enrolled in head start, kindergarten, and grade school. Many people with poorer means have children, but do not drive vehicles or vote. You could, for instance, add the names of all Native Americans in the State of Minnesota enrolled in our various tribes. You could add the names of all those who, anytime in the last 36 or 48 months, applied for general assistance, AFDC, subsidized housing, or food stamps. You could include the list of all those who became naturalized citizens within the last few years. We can think of enumerable ways to broaden the list of prospective jurors beyond car ownership and voting. We can mandate rules and regulations that those lists cannot be tampered with so as to selectively overlook those who might be on them. It appears the rules and regulations are now in place so voter registration and car ownership lists in Minnesota produce venire panels that appear random.

But once the venire panel has been called into the courthouse, through a method deemed as inclusive as possible, and as random as possible, the judiciary has to stop

tampering and tinkering with the confidential strategy between defense attorney and client when they exercise peremptory strikes.

The power is given to us and outlined in *Hershberger* and *Friedman.* The reasoning of the dissenters-concurrers of *Batson* and *McCollum* is before us, along with the reasoning in *Davis.* I suggest the failure to keep *McCollum* out of the State of Minnesota will pierce the image Minnesota citizens expect from its judiciary. When rights collide, if rights do, the act of setting priorities puts us under the searching light of common sense.

Former Chief Justice of the United States Supreme Court, Warren Burger, in his *Batson* dissent, foreshadowed the problem we face today. The entire dissent, joined by Justice Rehnquist, needs to be read carefully. *See Batson,* 476 U.S. at 112–34, 106 S.Ct. at 1731–43 (Burger, C.J., dissenting). I suggest it is all pertinent. It states in part:

> Today the Court sets aside the peremptory challenge, a procedure which has been part of the common law for many centuries and part of our jury system for nearly 200 years. It does so on the basis of a constitutional argument that was rejected, without a single dissent, in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

*Id.* 476 U.S. at 112, 106 S.Ct. at 1731.

It further states, relative to the unbroken history of the importance to justice of unhindered peremptory challenges:

> The Court acknowledges, albeit in a footnote, the "'very old credentials'" of the peremptory challenge and the "'widely held belief that peremptory challenge is a necessary part of trial by jury.'" But proper resolution of this case requires more than a nodding reference to the purpose of the challenge. Long ago it was recognized that "[t]he right of challenge is almost essential for the purpose of securing perfect fairness and impartiality in a trial." The peremptory challenge has been in use without scrutiny into its basis for nearly as long as juries have existed. "It was in use amongst the Romans in criminal cases, and the *Lex Servilia* (B.C. 104) enacted that the accuser and the accused

> should severally propose one hundred *judices,* and that each might reject fifty from the list of the other, so that one hundred would remain to try the alleged crime."

*Id.* at 118–19, 106 S.Ct. at 1734–35 (citations omitted). Chief Justice Burger continues:

> Permitting unexplained peremptories has long been regarded as a means to strengthen our jury system in other ways as well. One commentator has recognized:

> "The peremptory, made without giving any reason, avoids trafficking in the core of truth in most common stereotypes.... Common human experience, common sense, psychosociological studies, and public opinion polls tell us that it is likely that certain classes of people statistically have predispositions that would make them inappropriate jurors for particular kinds of cases. But to allow this knowledge to be expressed in the evaluative terms necessary for challenges for cause would undercut our desire for a society in which all people are judged as individuals and in which each is held reasonable and open to compromise."

*Id.* at 121, 106 S.Ct. at 1736. Chief Justice Burger elaborates:

> An example will quickly demonstrate how today's holding, while purporting to "further the ends of justice," will not have that effect. Assume an Asian defendant, on trial for the capital murder of a white victim, asks prospective jury members, most of whom are white, whether they harbor racial prejudice against Asians. The basis for such a question is to flush out any "juror who believes that [Asians] are violence-prone or morally inferior...." Assume further that all white jurors deny harboring racial prejudice but that the defendant, on trial for his life, remains unconvinced by these protestations. Instead, he continues to harbor a hunch, an "assumption," or "intuitive judgment," that these white jurors will be prejudiced against him, presumably based in part on race. The time-honored rule before today was that peremptory challenges could be exercised on such a basis. The Court ex-

plained in *Lewis v. United States* [146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) ]:

> "[H]ow necessary it is that a prisoner (when put to defend his life) should have good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has conceived a prejudice even without being able to assign a reason for such his dislike."

The effect of the Court's decision, however, will be to force the defendant to come forward and "articulate a neutral explanation," for his peremptory challenge, a burden he probably cannot meet. This example demonstrates that today's holding will produce juries that the parties do not believe are truly impartial. This will surely do more than "disconcert" litigants; it will diminish confidence in the jury system.

*A further painful paradox of the Court's holding is that it is likely to interject racial matters back into the jury selection process,* contrary to the general thrust of a long line of Court decisions and the notion of our country as a "melting pot."

*Id.* at 128–29, 106 S.Ct. at 1740 (emphasis added) (citations and footnote omitted).

I suggest that in *McCollum,* Chief Justice Rehnquist and Justices Scalia, O'Connor, and Thomas came to realize what former Chief Justice Burger saw instinctively in *Batson,* namely, that it suffered from the same defect of *Dred Scott v. Sandford,* 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1856) and *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). *Batson/McCollum,* like *Dred Scott* and *Plessy,* are "socially correct" but legally unsupportable, and through *McCollum* have come full circle to hurt the very citizens they are supposed to aid.

I suggest the 58–year gap between *Plessy* and *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) will mercifully, be shortened considerably between *Batson/McCollum* and the case that brings its demise.

In *McCollum,* I suggest that although Justice Thomas felt constrained by precedent to write a stinging concurrence rather than a stinging dissent as did Justices Scalia and O'Connor, he and I are quietly glad the Court was not so constrained when it wrote *Brown v. Board of Education.*

It is time now to see the unintended consequences of *Batson/McCollum.* We need to visit the streets, because it is in the streets where crimes happen, where investigation takes place, where witnesses are found, and where facts leading to life and liberty, or its deprivation, are found. Those facts are not found in the cool marble halls of judicial tribunals. We are too far removed from the reality of the streets to rest our decision on *Batson/McCollum,* without a visit.

To illustrate the unintended invidious effect of *Batson/McCollum,* let us use the example of a white male coming to a criminal defense firm and seeking help for the charge of a rape/murder of a black woman. In this firm is a young defense attorney, a black woman. She has realized her ambition to be employed by a downtown law firm with a criminal defense section where people are willing to pay large fees for the defense of their actions. The senior partner in charge of criminal litigation, seasoned and able, will quickly spot the potentially serious matchups of gender and race between the firm's client and the victim. If he has been impressed by his young associate's work to date, he will offer her the case. If she is a criminal defense attorney, she will accept it. The senior partner will bring the client in for the first interview, and after the partner leaves, the client will look at the attorney and she will read in his eyes the unspoken question, can you, will you, a black woman, help me now that you know what the case is about. If this is what she went to law school for, if this is what she wants to do with her life, the answer will be spontaneous—"You bet I can and I will. I have a number of questions to ask and many things to go over with you, so let's get started."

We now shift to the conclusion of the jury selection process. The panel is seated, the challenges for cause, if any, have been heard and decided. She quietly examines the list of jurors against her remaining peremptory challenges, knowing the prosecutor is quietly doing the same thing against his list. At the

conclusion of the peremptory striking process, she is down to her last strike and looking at three remaining prospective jurors, a white woman, a white man, and a black woman. During the question and answer period by the judge and both attorneys, these three exhibited nothing remarkable. The black woman constitutes the last minority sitting and not struck on the panel.

By now, because they have been together working on the case for six or more months, the client has developed complete rapport and trust with his attorney, and without hesitation, whispers into her ear at the counsel table, "I'd feel a little better if you would use that last peremptory on juror number 29, the black woman in the first row. What do you think?" The defense attorney whispers back, "Yes, I agree with you." She moves the court for a short recess to confer with her client and one is granted. In confidence, they discuss all the pros and cons of their last strike. The defense attorney agrees with her client and tells him that although nothing about the black woman juror jumped out in her mind, even before he had suggested it, she had made up her mind to go that way. She explains that she has already been through several criminal trials to verdict, including trials with jurors of all colors, and her instincts suggest she go this way.

The defense attorney exercises her last peremptory on the black woman feeling, among subjective choices, it is the best way to protect her white male client. The prosecutor mounts a *Batson* challenge. What does the black woman criminal defense attorney do? I suggest she rise to her feet, respectfully address the court, and lie. I suggest that her memory will quickly run through the index of the informal catalog already known to defense attorneys and prosecutors, setting out the preferred race-neutral *Batson* responses du jour. She will lead off with,[3] "Your Honor, I thought I noticed a slight hesitation when juror 29 answered your question, 'Could you be fair to both sides in this case.' I thought I noticed that when she looked in my direction and at

my client, there was some feeling of distance and a lack of solid eye contact." Then she will shift into what she hopes is the clincher: "Your Honor, when the prosecutor asked her whether she knew anyone closely connected with law enforcement, she stated that her second cousin, who she is close to, has a husband who is a policeman, and she went on to state that the three of them are close friends and have Sunday dinner at each other's homes as much as four times a year, plus some holidays." I suggest she will say whatever, because at that point in time, every ethical fiber of her body is concentrated, not on upcoming gender equality month, or racial diversity month, but on protecting her client. With the coming evidence against her client to be as bad as she knows it will be, she will bond with her client, if she is a good attorney, and fight and claw and hope and pray for a favorable verdict, if even a hung jury. I suggest she will be able to lie without being guilty, as an officer of the court, of lying to the court, because the catalog, the laundry list, the one thousand and one reasons to plug into step two of the *Batson* three-step *danse macabre* are known to ethical defense attorneys and ethical prosecutors, are taught and discussed, both informally and at CLE seminars, and today form the basis for taking honest attorneys on both sides and turning them into quibblers.

What business, what right, does *Batson/McCollum* have to select that moment to lecture her on civics by denying her peremptory challenge and forcing that juror on her client?

A trial judge's ethical obligation during a trial does not contain the straight bright line to client protection that the defense attorney's does. It cannot and should not. Judges are uniquely ill-equipped to overturn peremptory challenges and force jurors on an objecting defense attorney and the client under the guise of furthering the cause of justice. The judge has not conferred with the defendant in confidence, has not listened to his deepest fears and emotions, knows not whether he will or will not take the stand,

---

**3.** This discussion should take place out of the hearing of the jury. An *in camera* hearing is

preferable to a side bar conference.

nor knows what he will say if he does, does not know as thoroughly as the defense attorney what good and bad facts may emerge during the evidence. The factors of gender and race, like all other relevant factors in a person's life—economics, job status, marital status, number of children, present occupation, previous occupations, present and former occupations of spouse, friends, ex-spouses—are among the myriad factors that all competent attorneys bring to the peremptory decisionmaking process.

The underpinnings of *Batson/McCollum* deny the reality of human experience. The cruel irony is that those same realities are acknowledged, glorified, and purposely sought out and embraced, both officially and unofficially, by state and federal government action. We see the embrace of these realities in the selection process for federal and state committees, advisory boards, candidates for local, state and national political office, and the selection of judges. The richness of culture, the unique life experiences of women, of men, of people of color, are acknowledged to be bona fide criteria. At times this richness of culture and this richness of life's experiences gives a competent candidate an edge over other competent candidates, particularly when a committee, bench, or tribunal is deemed to be lopsided one way and an infusion of diversity is needed. Essays, newspaper columns, magazine articles, all recount and expand on the innate differences that women, men, minorities, whites, may bring to the decisionmaking body of a committee or tribunal. Yet, in the gravest of situations, a felony trial, we pretend that the defendant and his attorney should not use what they themselves have experienced to ensure that the constitutional guarantee of assistance of counsel, and a fair jury trial, be upheld. Why cannot the trial attorney and the defendant decide just how much richness of culture experience and life's experience that they want on a fact specific case. Why not leave this delicate, subjective judgment to the attorney and the client, where it has historically resided for hundreds of years.

In this example, the criminal defense attorney, if the *Batson* challenge is upheld and her peremptory strike denied, will clinch her teeth, and hope that shortly *Batson/McCollum* is exposed for what it is, benevolent racism. With the inevitable spread of *Batson/McCollum* to gender, religion, and ethnic origin, we can see coming the spread of benevolent sexism, benevolent religionism, and benevolent ethnicism. The benevolent racism in *Batson/McCollum* hits individual rights hard. We say to this individual defendant and his attorney that his previous right to exercise peremptory challenges needs to be submerged for some "greater good."

Now, just change the color of defendant from white to black and repeat all the other facts. Now the underpinnings of *Batson/McCollum* say to the black defendant:

> Although we concede that you are on trial for murder, although we concede that we have taken away from you a right you have enjoyed for centuries, can't you see that somehow this is "good for you" because in the long run it will be good "for your people."

Are these hypothetical scenarios? I suggest strongly they are not. With millions of blacks in America, many living in larger cities in this country in the more populated states, most of which have the death penalty, and where a disproportionate percentage of black males end up being charged with serious crimes, I suggest these scenarios, and this colloquy, are taking place and will take place.

Private conversations between a defendant of color and his attorney, in which they discuss their mutual agreement that a juror of color should be struck to enhance, if possible, the defendant's chance at a favorable verdict, cannot, by definition, be documented or cited to. Those conversations will be made in the atmosphere of the utmost confidence, and for obvious reasons will not see the light of day because, if revealed, they would spike any possibility that a *Batson* challenge could be rebutted. I suggest it is dangerous to all black defendants, all defendants of color, all defendants, and fatal to some, to argue that since a defendant's instructions to his attorney to exercise a peremptory, partly or wholly based on color, is not reported in the Northwest Second Reporter or the United

States Supreme Court Reporter, that it did not happen.

I suggest that criminal defendants, when the government approaches with *Batson/McCollum*, will come to understand, as the wrapping comes off, that it resembles, not a birthday cake, but a large wooden horse.

Justice Scalia called the *McCollum* extension "terminally absurd." *Alia iacta est.* I suggest that *Batson/McCollum* ranges from inexcusable ignorance to arrogance, worse, a smug meanness, when it strips from defendants a hitherto inviolable right under the guise of a social experiment. The dissenters-concurrers in *Batson/McCollum* speak eloquently that a criminal trial is no place for a social experiment; and they hit forcefully at the total lack of constitutional support for *McCollum.*

*Batson/McCollum*, as part of their rationale, discussed the possible hurt feelings of jurors excused by peremptory strikes, and how this might somehow affect their perception of justice. I suggest that a simple statement by the trial judge to the venire panel, what I was familiar with during 17 years as a defense attorney in northern Minnesota, suffices. The standard instruction by the court to the assembled venire panel would include, among other things, something along the following lines:

> Ladies and Gentlemen of the Venire Panel: Several names will be drawn at random by my clerk from a box containing all your names. Those names called will come forward and sit in the designated chairs in the jury box that I will point out to you. Then I will ask you a few preliminary questions for the benefit of both attorneys so that they can begin to get acquainted with you. Then it is the privilege and the right of both the attorney representing the defendant and the prosecutor representing the state to ask you individual questions about your background, about the facts of this case you are about to hear, and other questions that they may feel they wish to ask. These questions are not meant to pry into anyone's personal affairs or embarrass anyone, but both attorneys have an important stake in the outcome, and the law

allows them to ask questions of the jurors and listen to the answers. Following this question and answer period, each attorney is allowed a certain number of what we call peremptory strikes. A peremptory strike is a right given to both attorneys, and they are allowed to dismiss a limited number of prospective jurors for no reason. If you are so stricken from this jury, it does not mean you are not a fair person and could not hear this case. It simply means that the law requires us to start with more jurors than the 12 who will finally be seated, and a certain number need to be stricken to get to the figure 12. If you are so stricken from this jury, please report back to the jury room and await further instructions from me as there are more cases, both civil and criminal, on this calendar and you may well have a chance to serve another day.

The stricken jurors will get to go home and perhaps sit on a jury another day. To argue that perhaps any "hurt feelings" they might harbor surmount the defendant's right to exercise peremptories is to trivialize a heretofore precious right. To argue otherwise demeans the fierce debate at the Constitutional Convention where we would not have had a constitution had not those representatives of those states which insisted on a Bill of Rights gotten their way.

I suggest the jurors stricken by a peremptory, if they had it honestly explained to them after the trial that they were stricken because the defendant and his attorney simply wanted it that way, and because the defendant had that right, would, if asked whether this explanation satisfied any temporary ill feelings they had based on being stricken, agree that the responsibility for important subjective decisions should lie with the person who suffers the consequences.

As Justice Simonett noted succinctly in *Davis*, when challenges for cause leave the attorney with the lingering suspicion that something is there which was not expressed aloud, the use of a peremptory challenge is the saving cleansing grace. I suggest that Justice Simonett's reasoning in *Davis* was not based on a careful scrutiny of *Batson/McCollum* and the lower federal court

and state appellate courts around the country that have wrestled with *Batson/McCollum* since their issuance. I suggest rather his articulate reasoning was based on his own experience and that of the other seasoned trial attorneys with which he trod the length and breadth of central Minnesota laboring under the common law of Morrison County. I suggest his decades long experience practicing law in a rural community, working with his people, people with racial, religious and ethnic diversity, were of a help to his clients as he questioned juries and exercised traditional peremptory strikes, using the *entire* range of factors contained in Minn.Stat. § 593.32, subd. 1.

I suggest that when Justice Simonett and his trial colleagues exercised peremptories, factoring in when needed, client/juror match-ups of race, color, creed, ethnic origin, occupation, gender, marital status, et cetera, they did not see themselves as indulging in a constitutional "no no." I suggest they were not hurrying to get a few verdicts to the bank before they were exposed. I suggest, rather, that they were employed in the only professional ethical duty they commonly shared, the duty to use their legal skills in the best way possible to protect their client's cause.

The *Batson* extension into *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), which now includes all civil cases, should be of particular concern to that part of the trial bar which practices in the area of civil law. If *Batson/McCollum* cannot be stopped in this state through the use of the Minnesota Constitution, its inevitable extensions through the categories listed in Minn.Stat. § 593.32, subd. 1, will be applied to all civil cases.

The mischief cannot be adequately described in a few paragraphs, but I will try. Let's take two of the categories listed in subdivision 1 of section 593.32 at random, occupation and physical or sensory disability. Historically, a prospective member of the venire panel walking to the jury box, limping, using a cane, wearing a cast or a neck brace, or coming to the jury box showing evidence of a missing limb, has always been regarded as a proper red flag for questions by attorneys for both sides, particularly in negligence cases, one of the largest areas of practice in civil law. At times, that juror may be excused for cause. There are times their answers will seem correct and the judge will indicate that the challenge for cause has not been met. Incumbent upon the attorney's ethical obligation to protect the client's cause is the traditional use of the peremptory strike if his or her instincts indicate that perhaps some of the remaining jurors may be more suitable for this case than the one who evidences an obvious disability. And this is not necessarily so only for the defense bar. Depending on the juror's answers to questions, possibly revolving around their prior experiences with the system of trial by jury to determine negligence and damages, a plaintiff's attorney may quietly make the decision to use a peremptory on that juror if defense counsel does not.

Traditionally, certain occupations which call for a specialized and high degree of knowledge are marked for careful questioning by attorneys for both sides. Again, the juror's answers, if not sufficient for a challenge for cause, may lead to the use of a peremptory strike. Certain occupations such as RN's, LPN's, anyone connected with the medical profession, CPA's, engineers of all subspecialties, and anyone connected to the legal profession, may come to be the focus of a peremptory strike, not because they do not have an occupation, *and not because they might not bring the cultural and educational experience of that occupation into the jury room, but because they do, and because they might.* In civil cases, the same is true of race, color, creed, religion, gender, ethnic origin, age, economic status, and all the other personal factors either now under attack by *Batson/McCollum* or about to be attacked.

Yet one more example of the utter inability of *Batson/McCollum* to be reconciled with the trial bar's obligation to the client, even though *Batson/McCollum* be given lip service, can be gleaned from a recent article.

There are certain general areas of character and background that should be investigated for each individual venireperson. A generalized jury profile listing these fac-

tors can and should be developed and retained as a boilerplate document; it can then be tailored for each trial. It is important to recognize that each of these general qualification areas provides only a starting point for the more detailed inquiry which must follow[:]

* age

* gender

* marital status

* race and/or national origin

* educational background

* occupation and employment history

* socio-economic status

* personal interests and leisure-time habits

(hobbies, social/civic organizations, etc.).

Francis A. Spina, *Jury Selection in Employment Discrimination Cases*, For the Defense, March 1994. The article also contains the following statement which always was, is now, and will always be the truth of jury selection to practitioners whose career track involves selection of juries.

In theory, a goal of the civil justice system is the selection of a "fair, unbiased, and impartial jury." In reality, of course, each side hopes for a jury as biased in its favor, and as prejudiced against the opponent, as is possible. What each attorney really wants to do is identify those specific individuals who would be most desired by the opponent—and then remove them from the panel. The end result is therefore not a jury "selected" by the parties for their positive attributes, as much as it is the reluctant acceptance of those venirepersons who remain after the "de-selection" process has been completed.

The term "jury profile" refers to a collection or combination of characteristics and qualifications the attorney either would like each selected juror to have or would find unacceptable in a juror. Of course, the plaintiff's attorney will have a dramatically different jury profile than the defense attorney. Thus, from each attorney's viewpoint, there are two opposing profiles: the best-case juror and the worst-case juror.

*Id.*

Keep in mind this article was published in a respected trade magazine widely disseminated to the bench and bar a full three years after the release of *Edmonson*. The point is, the article cited *Batson* and *Edmonson* in passing, and then went right on to discuss race, gender, national origin, et cetera, as legitimate factors to consider in selecting a jury, depending on the individual facts of the case. This analysis is exactly the analysis used by competent civil and criminal attorneys. Centuries of tradition with logical underpinnings cannot be washed away in a social experiment which not only solves nothing, but "is likely to interject racial matters back into the jury selection process." *Batson*, 476 U.S. at 129, 106 S.Ct. at 1740 (Burger, C.J., dissenting).

To more fully understand how *Batson/McCollum* dies in the light of reality, now let us visit a few criminal trial scenarios which, in some variation, have happened in the past, are happening now, and will happen in the future. For purposes of these illustrations, I will use the inevitable extension of *Batson/McCollum* from race and color, to creed, religion, gender, and ethnic origin. We will now mix and match color, creed, and ethnic origin to touch different fact situations. First, assume that the defense attorney's client is a young black male who, while burglarizing a Catholic church in a Polish neighborhood, was surprised by the pastor, Father Tarnowski. Assume the defendant pulled out a knife and, in the ensuing struggle, the priest was killed. Assume the case is going to trial because the defendant insists that although he meant to burglarize the church, and meant to draw a knife to scare off the priest, he steadfastly maintains that during the struggle, the priest got the knife away from him and attempted to stab him with it, and that somehow he got it back and stabbed the priest to death in self-defense. Assume that the prosecution chooses not to believe the defendant and insists on a plea of guilty to murder I or a trial.

Assume next the defendant is an Asian American, a Hmong, and reputedly part of

"an Asian gang." Assume the victim is Father Patrick O'Brien, pastor of a church in a heavily Irish Catholic neighborhood. Assume next the defendant is Hispanic (at any given time, for defendant or victim, insert any race, any color—the point is still made) and the victim is a rabbi killed in his synagogue. Assume next the defendant is a Native American and the victim is a Lutheran minister in an area heavily populated by people of Scandinavian origin. Assume next the defendant is white and one of the above victims is a person of color.

Now change the victim's gender. Assume between the attempted burglary and the death of the victim, there is some evidence of an attempted sexual assault on a woman minister, a Catholic nun, or simply a woman member of that church's congregation who had the misfortune of surprising the defendant.

Do not suggest that in the above settings ethical defense attorneys and ethical prosecutors will not have the factors of race, color, creed, gender, and ethnic origin going through their minds as they question the jurors.

Do not suggest that if they mount unsuccessful challenges for cause, those factors might not form the basis for the use of a traditional peremptory strike.

Do not suggest the defendant in each instance will not talk to his attorney in confidence and suggest, plead, that particular attention be paid to these matters. Not because they do not exist, not because they might not surface in the jury room, but because they do exist, and because they might.

Do not suggest that matters of race, color, creed, gender, religion, and ethnic origin will not surface in the jury room, either overtly or subconsciously, and could not make a difference in a juror's vote.

Do not suggest that a single vote from a strong willed juror could not mean the difference between murder I, murder II, murder III, manslaughter, and not guilty.

Do not suggest that the underpinnings of *Batson/McCollum* will not be stripped bare, exposed, and tested.

Do not suggest they will help.

I suggest that when the delicate sensitive issues of religion, and the others, interject themselves into a criminal trial, either through matchups involving the defendant, victim, and juror, or from the volunteered responses of a juror during voir dire, the judiciary respectfully get out of the way! I suggest that the traditional right of defendants to exercise peremptories for no reason has a purpose in the overall scheme of justice, and one of those purposes is demonstrated here.

To understand the volatility of a jury room during deliberation, to understand the importance of a single juror that Justice Simonett alluded to, rent a video of the old black and white Henry Fonda movie, "12 Angry Men." The entire movie takes place in a New York jury room where 12 men decide the fate of a young man from the slums charged with first degree murder. All 12 jurors are white, but the producers deliberately sprinkled through the 12 easily identifiable job occupations, economic status, and ethnic origin. Hollywood understands diversity among ticket buyers.

The movie revolves around one juror's attempt, the part played well by Henry Fonda, to convince the other 11, not necessarily of the defendant's innocence, but at least to think first and to vote later rather than enter the jury room, vote guilty, give a few perfunctory reasons, and without reflection, leave for their homes feeling they have been a part of justice. As the movie unfolds, the cultural and life experiences of each juror *come to play a part* in his slowly coming to grasp the importance of the state's burden of proof beyond a reasonable doubt, and the importance of the defendant's presumed innocence. Ethnic origin, being raised in different parts of the city and of the country, and being part of a specific economic class, *are part of their thought processes in coming to final verdict.* It needs to be realized that the opposite of the happy ending could just as well have been the case. One or two or a handful of strong-willed jurors who entered the room, fighting against the majority's announced intent to vote not guilty, could have, through force of will and force of persuasion, changed the votes of the other jurors, and

put the defendant in harm's way of prison or death.

I suggest the point of the movie needs to be reflected upon before the *Batson/McCollum* majorities' disdain for the experiences of life and culture is accepted. It needs to be understood that jurors are human beings and bring into the jury room their life experiences.

It needs to be understood that each defendant of color, each member of any race, might not always want a person of his color, or a person of another color but still a minority, to be granted the preferential right of *Batson/McCollum* not to be struck from a jury because of their cultural experiences as a person of color. Within each minority there are myriad differences and subdivisions of culture, including ethnic likes or ethnic dislikes toward each other. Put in the converse, who is to say that black defendants do not want the traditional (unhindered) right to use peremptory challenges on Hispanics, Native Americans, and Asian Americans. Who is to say that Hispanics do not want the traditional right to exercise peremptory challenges on blacks, Native Americans, and Asian Americans. Who is to say that Native Americans do not want the traditional right to exercise peremptory strikes on all other persons of color. Who is to say among the Asian American community that Chinese do not want the traditional use of peremptory strikes against Japanese, Koreans, Laotians, Vietnamese, and the multiple divisions that make up what we call Asian American. Who is to say that blacks do not want the traditional use of peremptory strikes against Chinese, Japanese, Koreans, and so forth, through the infinite permutations and combinations that exist.

With regard to jurors of ethnic origin, it ought not to take but a few short paragraphs to satisfy all, assuming we have any sense of history, that, depending upon the facts of a particular case, defendants might resent the taking away of their historical free use of a peremptory. Simply reflect upon a few of the following matchups between defendant, victim, and juror. I suggest Irish/English, Northern Ireland/Southern Ireland, German/France, Serbian/Croatian/Slovanian/Bosnian, Polish/Russian/Bulgarian/Czechoslovakian, Russian/Latvian/Lithuania/Estonian, Norway/Sweden/Finland/Denmark, Spain/Portugal, Spain/Basque, Moslem/Hebrew, Italy/Sicilian, Greece/Macedonia/Albania, and there are others.

For the sake of common sense, and an honest acknowledgement of human nature, can we abolish the rigid formula of *Batson* which declares what people think, and then declares what they shall not think. Let us retake the subjective judgmental process of exercising a peremptory away from those who do not serve the sentences, do not represent the client, and transfer it back to the historical owners, those that do.

Mix together the realities of race, color, creed, gender, religion, and ethnic origin, and take the debate to areas of this state (and there are far more than the three I mention) such as Stearns County, Northeast Minneapolis, and the Iron Range. Now set out the proposition that these matters cannot be of any concern to attorneys and defendants, and if they should pop up in one's mind by accident, they need to be suppressed, and an "approved list" of reasons, other than these, must be offered to the judge at step two, with the hoped for result, and without the protection of a true peremptory strike, if the proffered reasons fail. That proposition will invite debate. To the debate bring lunch, supper, a midnight snack, a sleeping bag, and what hockey players call a cup.

Iron Range trial attorneys lick their chops and order large snowmobiles when the opposition gets off the plane armed with wingtips and a law review article, or judicial opinion, entitled "The jury as an indistinguishable and amorphous mass divided into only two known subgroupings, noncaucasian and caucasian."

It is common for out-of-town attorneys coming to the Iron Range to perhaps contact a colleague or acquaintance who practices there and ask to go over the jury list with the local attorney to attempt to spot client-juror matchups. They do not ask which juror will have "shifty" or "sullen" eyes, or which one might answer with hesitation, the traditional cure-all question, "Can you be

fair?" Serious trial attorneys representing clients do not waste time on "let's pretend." Rather, they seek honest advice as to the rich, cultural diversity of the Iron Range.

Over the course of two decades of practicing law on the Iron Range, I represented several hundred clients on felony matters, including all degrees of homicide, several of which went through trial to verdict. Particularly in the murder cases, I was assisted (and prosecutors and other defense attorneys sought similar assistance from law enforcement personnel and/or colleagues) in going over the jury list before trial and during the voir dire and peremptory strike portion of the trial by my woman partner, my male partner, my wife, and a woman voir dire consultant. Depending on the particular facts of the case and the evidence I anticipated coming out during trial, and weighing the factors mentioned in Minn.Stat. § 593.32, subd. 1, and my client's advice, there were times when a woman juror was the subject of a peremptory, not because she was not a woman, and not because she might not bring a woman's perspective back to the jury room, but because she was and she might. At times a man was the subject of a peremptory. Not because he was not a man, and not because he might not bring that perspective to the jury room, but because he was and he might. At times jurors of color, and jurors of ethnic origin, were the subject of a peremptory strike (all these examples applied equally to both sides, defense and prosecution), not because they were not persons of color or did not have a particular ethnic origin, and not because they might not bring that perspective back to the jury room, but because they were and because they might.

Iron Range trial judges, because they grew up and practiced law in northern Minnesota, were understanding and accepting of the process. I suggest none of us foresaw the day when the reality of human experience would be buried under social rhetoric, and we would be forced to manufacture socially acceptable reasons rather than speak the truth.

If an attorney, claiming to be a trial attorney, does not understand voir dire, and does not understand the intelligent use of the subjective process by which traditional peremptory strikes are taken, it should be difficult for that attorney to accept hard earned money from clients. From time to time in civil cases, the attorney will cost his client money. In criminal cases, he will just cost them.

Because of the number of reservations in northern Minnesota, a percentage of my trial practice was the representation in court of Native Americans. On one occasion, my Native American client leaned next to me during voir dire and told me he would feel better if I struck juror "X." Juror "X" turned out to be the only Native American in the jury box and the only one in the venire pool. "X" was neatly dressed, wore a suit and tie, answered the questions put to him by the court and both attorneys openly and honestly, at least I thought so, and I had him marked for a probable "keeper" if the prosecution did not make him the subject of a peremptory. I obtained a short recess and talked to my client in confidence. My client explained to me that the juror was an "urban Indian" and that he, meaning my client, would be seen by "X" as a "reservation Indian." My client explained to me his litany of juvenile court appearances, traffic offenses, some of which included drinking, and a previous time or two in felony court. He advised me that he seldom had the ability to find steady work and directly support himself. He availed himself of the grants and benefits available to Native people who stay on the reservation. Then he explained to me that he knew a little bit about juror "X." He knew that juror "X" had lived on the reservation while growing up, but as an adult had moved off and made a success out of himself by what my client called "the standards of the white world." Juror "X" was an independent businessman, was known to be involved in a few successful business ventures, and my client suspected juror "X" might consciously or subconsciously look down his nose at my client and wonder why he did not try harder to make something out of himself as juror "X" did. I accepted my client's sound advice and exercised a peremptory. I did make a mental note that I still felt juror "X" would make a good juror for one of my criminal

cases that term. I had him marked as a man who likely knew poverty and racism growing up and would understand that perhaps sometimes the power of the state seems to be used arbitrarily. But for that trial, I exercised a peremptory on "X", not because he was not a Native American, not because those cultural experiences of his might not surface consciously or unconsciously within the jury room, but because he was, and because they might.

Today, if I tried to explain to that same client that Batson/McCollum would force his attorney to come up with artificial reasons rather than reality, my client would listen close and then ask questions. First, I would explain that Batson only laid this burden on the prosecution and that he, still being free to strike whomever he wanted, actually gained a slight advantage through Batson. I would explain to my client that if the prosecutor, not knowing what my client felt, used a peremptory on "X," that would be to my client's advantage. If I did not raise a Batson challenge, the prosecution would then have used up one of his limited peremptories, and would have saved for us one of our precious few.

I would then explain that through the McCollum extension, the table was now turned, and we were now equally disadvantaged. If I used a peremptory on juror "X," and the prosecutor sniffed out my motives, he might raise a Batson challenge and if I could not meet it in step two, juror "X" would sit to verdict. I suggest my client would listen carefully, as his liberty was at stake. My client would then tell me that the McCollum extension meant that overall, Batson/McCollum was just another white man's word for "treaty." I suggest he would then turn and walk away. I could run after him and explain that somehow Batson/McCollum, even though it might injure him in his case, was an overall social good, and that somehow it was a great thing for "his people." I suggest I would be talking to footsteps.

Inevitably, Justice Thurgood Marshall's concurrence in Batson wherein he suggested that all peremptories be eliminated from all trials, will become an issue. Some may claim it supports McCollum. Those supporting McCollum may contrast the lengthy experience of Justice Marshall with the shorter experience of Justice Thomas. I suggest there is an answer. I suggest that Justice Marshall, growing up a black man and working as a black attorney decades ago in the south, became so incensed at the racial injustice he perceived, that he watched while on the Supreme Court for what he hoped would be a way to help. It is clear that he felt Batson gave him the proper tool. What needs to be understood is that he left the bench a few years thereafter, and was not there to vote on McCollum. He did not have the benefit of the dissents-concurrences in McCollum. He did not experience McCollum's impossibility of management, its makeshift attempts by courts to understand it, and its denial to black defendants, the group he wanted to help, of their traditional right to strike another person of color if the defendant and his attorney decided it was in the best interests of the case.

When government moves to impose a top-down solution to an important problem, four questions need to be asked: (1) what does it cost; (2) where has it worked; (3) is it consistent with the values of our society; and (4) what are the unintended consequences. Batson/McCollum can answer none of these four questions satisfactorily. Number four, the "unintended consequences," is the answer to any attempt to believe that the elimination of traditional peremptory strikes is a solution to anything.

The unintended consequences of Batson/McCollum are as follows. First, the perceived problem of prosecutors using peremptories for other than "permissible" reasons still exists. Each state court, each federal court, is conversant with the laundry list, the catalog among attorneys, the made-for-reasons to get around step two of the Batson three-step process. The second consequence of Batson is McCollum. Now, all criminal defendants suffer a severe invasion of their right to trial by jury and their right to the assistance of counsel.

Prosecutors did not before Batson and do not after Batson/McCollum, "protect the jury." They do not protect anybody but their client, the state. Today, they still con-

tinue to use their peremptory strikes to impanel a jury that they hope will be more prone to convict than to acquit. The absurdity of the third prong of *McCollum* can be adjudged in many ways, but use a simple one. When the defense attorney uses a peremptory on a person of color, and the prosecutor has already quietly marked that juror for a possible strike himself, he does not jump up and make a *Batson* demand, as he knows that if the *Batson* challenge is successful, that juror will sit. The competent prosecutor just keeps his mouth shut and accepts the fact that the defense has saved him a peremptory. The prosecutor also now knows part of the defendants confidential strategy in selecting the jury. Before *Batson,* neither side could do anything about that, as both enjoyed the traditional right of free peremptory strikes. Now, *Batson/McCollum* becomes a prosecutorial weapon. When the defense attorney strikes a member of a protected class that the prosecutor would like on the jury, the prosecutor mounts a tactical *Batson* challenge with a three-fold purpose. If the challenge is successful, he knows he has forced a juror on the defendant that the defendant does not want. Second, the prosecutor has a possible chance to embarrass the defendant and the defense attorney in front of the jury by making them appear racist. Third, the prosecutor has a chance to ingratiate himself with the jury panel posing as the "protector" of rights.

When prosecutors use *Batson* challenges today, it has nothing to do with race relations. I repeat—it has nothing to do with race relations or improving them. It is simply an attempt to keep a juror on the jury that he has preliminarily selected as a "keeper," and now his instincts are confirmed by the defendant's attempted use of a peremptory.

The same thing is true for the defense attorney. When the prosecutor uses a peremptory against a member of a protected class, if the defense attorney has preliminarily marked that juror for a peremptory strike, he remains silent, and feels a sense of relief that he has saved a peremptory. If the defense attorney wants to keep that juror, he mounts a *Batson* challenge, not to "protect" anybody's civil rights, but simply because he has made a strategic decision that the juror may be beneficial to his client. *Batson/McCollum* has simply produced a shell game between defense attorney and prosecutor, nothing more.

I suggest strongly that neither prosecutor nor defense attorney are interested in discrimination or bias against any person, for its own sake. As stated throughout this opinion, questions of race, color, creed, religion, gender, ethnic origin, occupational status, age, economic status, other life experiences, are factors that filter through a competent trial attorney's mind as they attempt to judge who would be a better juror for their client. *That is the only way* peremptory strikes are used, and the only way they will be used in the future, regardless of *Batson/McCollum* rhetoric. *Batson/McCollum,* with its inevitable extensions, unless stopped, will put every single juror in a protected "class" and no attorney will be allowed to strike the juror for who they are, for what life's experiences they have, but will only be allowed peremptory strikes when they can justify to the trial court made-up artificial nonsense. For *Batson/McCollum* to be honored in the acceptance, not the breach, you have to destroy the jury system, and severely damage the right to counsel.

What now for the State of Minnesota? I suggest that the rationale of *Batson/McCollum* needs to be met head on in the light of the Minnesota Constitution, and if there is no fit, it should be stricken from this state's concept of due process for its citizens. I suggest that it cannot be tinkered with and shored up any more than the Titanic could be shored up when only three feet of guardrail could be seen above the water line before it plunged to the bottom. I suggest it cannot be propped up, modified, or, in Justice O'Connor's words, "transmogrified" so that somehow we can avoid its politics of hate and its politics of divisiveness.

To stick our heads in the sand of judicial ego and attempt to save it would be, I suggest, akin to a wealthy new car owner who, being overly proud of the lemon he has just purchased, stubbornly insists on buying more

and better tires and a larger and more expensive battery, when the engine, the drive train, and all internal components have been deemed, by objective examination, to be irreversible junk.

I suggest *Batson*, standing alone, might survive Minnesota constitutional scrutiny. As Justice O'Connor pointed out, historically there have been certain rights reserved for criminal defendants which *do not* call for similar rights to be granted to the state. The defendant alone, of all witnesses to a trial, has the only absolute right to take the stand or not take the stand, totally in his own discretion. On the subject of whether to waive a jury trial and consent to a bench trial, the defendant has the last word. The disclosure demands on the prosecution pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) do not have a full parallel for the defendant.

It would be constitutional, I suppose, to subtract from the state's present number of peremptories, nine in a murder I case, and three in all others, and allow the state the traditional use of peremptories, but of a lesser number. If that be the compromise, do not suggest that to give lip service to *Batson/McCollum*, the defendant's traditional fifteen in a murder I case and five in all others, should also be cut down. To do so would be like determining that since some prosecutors make exceedingly long and exceedingly boring closing summations, that henceforth all prosecutors and defense attorneys will be limited to a maximum of 60 minutes for a closing summation. I suggest that as to prosecutors, such a limitation would be silly, unworkable, but might pass constitutional scrutiny. I suggest that as to the defense attorney, it would be silly, unworkable, and would not.

If we do nothing with *Batson/McCollum*, I suggest we will experience the following. I suggest trial attorneys will continue to perfect the art of prevarication and expand the "catalog" and "laundry list" of approved answers to give at the second stage of *Batson*. Competent trial attorneys have always found a way to deal with the truth of reality. I suggest in time, defense attorneys and prosecutors, adversaries in the courtroom, but colleagues outside the courtroom, will quietly discuss unrecorded agreements centering around "if you don't, I won't," meaning they will agree to not interfere with each other's right to use peremptory strikes. With both sides' experiences, they will instinctively realize that since this was the situation prior to *Batson/McCollum*, and all crimes were tried under this system, no advantage or disadvantage to justice will result when reality returns to jury selection.

Trial judges may wish that *Batson/McCollum* had never reared its head. Wish away. Tedious side bar and in-chambers discussions will continue to mount. As *McCollum* moves into gender, ethnic origin, and even further, there will be increasing pressure on attorneys to settle cases, as the increased length of jury selection will play on already crowded calendars. There will be pressure on trial judges, as there is now on basketball referees and hockey linesmen, to "roughly equalize the foul calls." The defense attorney who has won five straight *Batson* challenges had better have the sixth as tight as a drum. The prosecutor who has lost seven straight rulings, and complains in chambers that the defense attorney "is getting his jury" will, when his next race neutral reason for a peremptory strike is that the juror is wearing a tie that says "Free Elvis Presley," receive careful consideration he might not otherwise deserve.

The second stage of *Batson* hurts a defendant, humiliates the two attorneys by making them play "let's pretend," and frustrates and trivializes the trial court by making it judge the pretend and not the truth.

Trial courts will look to the Minnesota Court of Appeals for relief. For the Minnesota Court of Appeals, there will be an increasing flood of petitions for interlocutory appeals on the trial issue of *Batson* challenges. There will be increasing petitions for writs of prohibition and writs of mandamus. A *Batson* challenge will become part and parcel of every appeal. I suggest overworked public defenders will consider ordering large rubber stamps from printing houses that have "*BATSON* CHALLENGE" in block letters followed by four blank lines underneath, and they will instruct their typ-

ist how to fill in the blanks. I suggest we will have hopelessly divided panels at times as the subjectivity of *Batson/McCollum* filters through each of our minds. We will be expected to see into the mind of the trial judge who attempted to see into the mind of the defense attorney, and into the mind of the prosecutor, both of which attempted to see into the mind of the juror at question. We will be forced to solemnly and knowledgeably debate the cut, color, and waist measurement of the Emperor's clothes. That subjective filtering will leave our consciences strained, twisted, and wrung out to dry like curds in the cheese-making process.

*Batson* challenges differ from all other evidentiary issues on appeal. When a trial attorney objects on the grounds of hearsay, irrelevance, or "best evidence," to take some objections at random for purposes of argument, we can focus on the record which discloses the objection and the trial court's ruling. We do not have to concern ourselves with the scenario, to draw a parallel to *Batson/McCollum*, where, for "social" reasons, the "prejudicial effect outweighs the probative value" objection, has been ruled a constitutional no-no, and we must now guess whether it crawled back into the trial. We do not have to get inside the head of the attorney who made the objection of hearsay or irrelevance, and subjectively determine whether the "bad thinking" prejudicial effect versus probative value objection played a minor or significant part in the proffered objection of hearsay/irrelevance. We do not have to do a mind dance on traditional objections. With *Batson/McCollum*, first the two attorneys do a mind dance on what the juror said with his or her lips, versus what the juror is really thinking. Then the trial judge does a mind dance into the head of the attorney who is trying to answer step two of *Batson*, and then our court will have to mind dance through everybody!

I suggest we may informally attempt to come up with bright lines. Some may feel if the race neutral reason looks 90 percent or better, it was then a good reason. Others may feel 80/20 or 70/30 may suffice. Some could take the position that if there is one percent taint in the so-called race neutral

reason, the *Batson* challenge should have been upheld. Who is right? Who is wrong?

We will look to our state supreme court for guidance. I suggest for the Minnesota Supreme Court there will be increasing pressure to accept more and more petitions for review on the full range of *Batson/McCollum* challenges. There will be pressure to give guidance, to set bright lines, workable and airtight, for the entire state. I suggest that when mortals wrestle with Godzilla, there will be severe bruising. I suggest sleepless nights, if they wrestle with the angel of death.

For the entire judiciary, whenever a juror has been placed on a criminal jury over the objection of the defense attorney and his client, and the verdict is guilty, will we, like Pilate, feel we have washed our hands clean. Or will we, at 3:00 a.m., lying in bed, stare at the dark ceiling where the hobgoblins and demons of crucial decisions dance in our mind? Will we review our judgment and peacefully fall asleep? Or will we lie awake through sunup wondering if our hands are not a little bit sticky?

To settle the issue, at least for Minnesota, there is a temptation to revisit the fourth prong of McCollum, the one that states the right of an individual juror not to be subject to a traditional peremptory strike outweighs the right of the defendant in a criminal trial to use one. The proposition hangs out there, stark and forboding, outlined like the hangman's noose against dawn sky. But I have said what I can. Those reading will fill in what I have missed.

Can Minnesota decide *Batson/McCollum* does not fit under our state Constitution? If other states and the federal courts continue to apply *Batson/McCollum*, can Minnesota go it alone? The answer is yes. The First Minnesota gave full measure at Gettysburg; the Second at Chickamauga. We can ride ahead, we can ride alone. We do now in *Hershberger* and *Friedman*.

For the judiciary to experience the unworkability, the sheer inanity, to use Justice Scalia's expression, of *Batson/McCollum*, just focus on those fact situations where the criminal defendant has been denied a per-

emptory, the jury sits to verdict, and the verdict is guilty. "Mildly," these cases will be a problem.

The following example will also present a serious problem, but less so. I will visit the lesser problem first. When the prosecution exercises a peremptory on a member of a protected class, when the peremptory, over objection, is allowed, when the juror is dismissed, another substituted, the case goes to verdict, and the defendant is found guilty, there may be an appeal. Among other alleged errors on appeal, or perhaps the only one, the defense will argue that their overruled *Batson* challenge should have been allowed, and the dismissed juror should have been allowed to sit to verdict. Now, assume that upon appellate review in this court, or the supreme court, the trial court is found to have abused its discretion in not allowing the defendant's *Batson* challenge, and error is found. It can be, perhaps it always will be, found to be serious error, but the discussion will always have an artificial air around it, because we will never know how the dismissed juror would have voted, even when we find upon appellate review that they should have been allowed to sit and vote. Every day throughout this state and this country, civil and criminal attorneys receive unfavorable verdicts, even in trials where they exercised all peremptories without objection, and had what they thought to be "a good jury" going into the juryroom.

*But the rubber hits the road* when a defendant of color attempts to use a peremptory on a juror of color, the prosecution mounts a successful *Batson* challenge, and that juror sits to a verdict of guilty. Now we know how that juror voted, we know that juror voted guilty. Assume now on appellate review, the trial judge is found to have wrongly sustained the prosecution's *Batson* challenge, and the appellate panel decides that the defendant and his attorney should have been allowed their peremptory strike. Now what do we do? Once having made that determination, how would a court verbalize the mantra of harmless error? It will be pretty tough.

In Minnesota criminal cases, with unanimity being an untouchable prerequisite for a guilty verdict, each individual juror's vote is an undivided essential part of a legal verdict, and we have now ruled that a juror of color, or some other protected class, improperly sat to verdict. Defense attorneys will pound away that our appellate conclusion of trial court error is automatically grounds for reversal and remand for a new trial. That argument will be made, and it will carry heavy water. What if the defense attorney had two, three or four peremptory strikes taken away by successful *Batson* challenges by the prosecutor, and we find error on two, three or four, et cetera? Now, multiple jurors have been found, upon appellate review, to have been improperly seated and improperly allowed to vote guilty. Do we devise a bright line that two or less improperly seated jurors is harmless error, but that three or more is reversible error? I suggest that will be difficult to sustain when every individual juror on a criminal case has to be part of a guilty verdict before the guilty verdict can constitutionally stand.

Now let us put some real life defendants and victims into this real life scenario. The kind that defense attorneys and clients live with. The kind the media dramatizes. The kind that often brings public pressure to "do something." The kind where the fallout may leave minorities with less right than before. Assume the defendant and the victim are persons of different races. *Batson* tells us that black defendants can have a new trial when black jurors are not allowed to sit on the jury. *McCollum* tells us that when black jurors have been improperly allowed to sit on a case involving a black defendant, then that can be error. Assume that the improper seating of a juror of color over a minority defendant's objection is found to be error, and as I suggest, more than harmless error, how do we explain this. The media and public have been conditioned, spoonfed by *Batson,* to believe that all black defendants always want any juror of color on their jury, regardless of all other factors. The media and the public will say, "did not *Batson* settle all of this race and discrimination stuff on juries? Now you are trying to tell us that minority defendants who were found guilty get new trials when minorities are not on the

jury, and minority defendants get new trials when minorities are on the jury!"

Tell them that yes, first under *Batson* and now under *McCollum*, minority jurors taken off a jury can be error, and minority jurors put on a jury can be error. If the judiciary wants to carve itself a tenth circle in Dante's hell, and drive down, we have the vehicle. If we want to finish the task of undermining the right of defendants of color, of all defendants, and their attorneys, to fight for justice at trial, just continue the hollow social experiment of *Batson/McCollum*.

What Justice Thomas tried to tell us (albeit with more brevity), I have tried to support:

> I doubt that this departure will produce favorable consequences. *On the contrary, I am certain that black criminal defendants will rue the day that this court ventured down this road that inexorably will lead to the elimination of peremptory strikes.*

*McCollum*, —— U.S. at ——–——, 112 S.Ct. at 2359–60 (Thomas, J., concurring) (emphasis added).

If Justice Thomas and myself are the only ones who hear the bell, it still tolls. *The truth is not negotiable.* When Galileo left the Inquisition hearing, the judicial tribunal had just reestablished, to its own satisfaction, the natural order of the universe (never mind what the stars and the planets felt). Reputedly, Galileo was heard to say as he left the room, "I don't care what they made me say in there, the earth still revolves around the sun."

Is there a way around this issue? Yes, there is. Appellate courts can be careful to always affirm a trial court's ruling that the prosecutor successfully mounted a *Batson* challenge when a minority defendant attempted to strike a person of color. Thus we always rule the juror the defendant did not want was properly seated.

I suggest able criminal defense attorneys will watch and catalog our rulings in this situation. If a systematic pattern of affirming a trial court develops and we are seen as avoiding the issue, if *Batson/McCollum* is still the law in Minnesota and federal courts, they will have us into federal court asking for discretionary review on the grounds that the State of Minnesota is denying due process to defendants, and they will accuse us of using a mean double standard to duck hard questions. If they are able to make that case, our answer will be painful.

Another way out of this swamp would be to send a hint to trial courts, and hope they catch on, so they routinely allow defendants, when using their peremptories on jurors in a protected class, to be successful over the prosecutor's *Batson* challenge. That resolves the issue, and upon appellate review, we will never be in the position of having to find error when the trial court improperly allowed a prosecutor's *Batson* challenge and forced a juror to sit to verdict over a defendant's peremptory strike. If trial courts routinely allow defendants the unhindered use of their peremptory strikes, that would be a good idea. But I see a problem. We give the trial courts discretion, but unbridled discretion? Can we not carry it one step further to its logical conclusion, and take the burden off the trial courts to save us from ourselves, and place it squarely where it belongs. Can we not state in Minnesota that all criminal defendants, all the time, retain their centuries old right to free use of peremptory strikes. How would we justify such a novel solution?

I suggest we respect the implied observation of Justice O'Connor and former Chief Justice Burger, that since the judiciary can spell "peremptory," why cannot we look up its definition.

> "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control."

*McCollum*, —— U.S. at ——, 112 S.Ct. at 2363 (O'Connor, J., dissenting) (quoting *Swain v. Alabama*, 380 U.S. 202, 220, 85 S.Ct. 824, 836, 13 L.Ed.2d 759 (1965)).

> The peremptory challenge has been in use without scrutiny into its basis for nearly as long as juries have existed. "It was in use amongst the Romans in criminal cases."

*Batson*, 476 U.S. at 119, 106 S.Ct. at 1735 (Burger, C.J., dissenting).

In assessing the task of reversing *Batson/McCollum*, or at least *McCollum*, is there precedent, for a state or for a nation, to declare that a "solution" went bad and needs to be eliminated? I suggest the Volstead Act will do. The Eighteenth Amendment ratified January 16, 1919, instituted 14 years of Prohibition. After the searching test of hands-on experience, it was gratefully put to rest by the Twenty-first Amendment on December 5, 1933. The social question of whether one ought to drink alcohol may remain. But it cannot be denied that the explosion of illegal drinking, and the concomitant aid to the criminal element that took advantage of the law led to an undeniable assessment by this country that the solution, Prohibition, became a far worse problem placed upon the back of America than any perceived problem Prohibition attempted to cure. I suggest *Batson/McCollum* is in this category.

Ultimately, I have faith in the Minnesota Constitution and its devotion to jury trial and assistance of counsel. I suggest it will help us determine that oxygen cannot be pumped into *Batson/McCollum*. The cancer is under the microscope and I suggest no other solution than excision. I suggest that is so if we are to heed a tenet of the ancient Hippocratic Oath, "Physician, first do no harm."

PARKER, Judge (concurring specially).

I join Judge Randall's special concurrence in urging the Minnesota Supreme Court to reject the *Edmonson* and *McCollum* extensions of *Batson* as infringing upon the rights and privileges guaranteed by the Minnesota Constitution. I would further urge that *Batson* would survive scrutiny under the Minnesota Constitution only because of the unique duties imposed upon prosecutors in criminal cases.